713 A.2d 1051 (1998)
314 N.J. Super. 1
Kim PATTON, Plaintiff-Appellant,
v.
Wendy AMBLO, M.D., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 9, 1998.
Decided March 26, 1998.
*1052 Richard Galex, E. Brunswick, for plaintiff-appellant (Galex, Tortoreti & Tomes, attorneys for appellant; Mr. Galex, on the brief).
Daniel J. Pomeroy, Springfield, for defendant-respondent (Mortenson & Pomeroy, attorneys for respondent; Mr. Pomeroy, of counsel and on the brief).
Before Judges NEWMAN, COLLESTER and LESEMANN.
The opinion of the court was delivered by NEWMAN, J.A.D.
This medical malpractice action stems from injuries suffered by plaintiff Kim Patton when her stomach was punctured during a laparoscopic tubal ligation performed by defendant Dr. Wendy Amblo. After a fourday trial, a jury returned a verdict in favor of defendant. On appeal, plaintiff raises three issues: (l) the trial judge inappropriately charged the jury with the "exercise of judgment" instruction; (2) the trial judge improperly interfered with and limited plaintiff's cross-examination of defendant's expert witnesses; and (3) the jury verdict was against the weight of the evidence. We agree with plaintiff's first argument and reverse and remand for a new trial.
After having four children, plaintiff, then age 36, decided to have a laparoscopic tubal ligation. After consulting the Women's Health Care Clinic in Elizabeth, she entered Elizabeth General Hospital on February 25, 1994 for one-day surgery. Because this type of procedure is performed through or directly below the navel, plaintiff expected no scar.
On the morning of her surgery, plaintiff met defendant, an obstetrician/gynecologist at the Women's Health Care Clinic. Defendant informed plaintiff that she would feel some discomfort and pain in her abdominal area after the surgery.
Once in the operating room, plaintiff was placed under a general anesthesia. Defendant prepared to perform a "closed laparoscopy," in which the surgeon makes a small incision with a scalpel either in or directly below the navel, through which an instrument called a Veress needle is placed. The Veress needle is used to insufflate the abdominal cavity with carbon dioxide, in order to form a pneumoperitoneum, or a "sac" of gas which protects delicate organs by pushing them away from the skin. The pneumoperitoneum also allows the surgeon better access to the fallopian tubes for cauterization. Once the abdomen is insufflated, the Veress needle is removed and a trocar is placed in the incision, which enlarges the incision and ultimately allows a laparoscope to enter the abdomen so that the operation may be completed.
A trocar is comprised of two separable components: a sleeve and a spike which goes through the sleeve. At this stage in a closed laparoscopy, the surgeon places the trocar spike, while in its sleeve, in the abdomen to enlarge the initial incision. The trocar spike is then removed, although the sleeve remains, and the laparoscope is placed through the sleeve to complete the remaining steps of the procedure. During the entire operation, carbon dioxide is constantly pumped into the abdomen through a port in the trocar sleeve to maintain the pneumoperitoneum.
Three layers of tissue separate the outside world from a person's internal organs: the skin (the outer layer), the fascia (the middle layer), and the peritoneum (the inner layer). Generally, the surgeon's initial scalpel incision pierces only the first two layers: the skin and the fascia. The Veress needle, a sharp object, is then inserted into the incision and the surgeon, upon feeling resistance, *1053 pushes it through the peritoneum and into the peritoneal cavity, which houses the intestines, the colon and the stomach. Defendant testified, however, that she did not feel any resistance when she placed the Veress needle through her initial incision and into plaintiff's abdominal cavity. She therefore probed the incision with her finger and determined that she had already broken through the peritoneum. Accordingly, she concluded that she did not need to use the spiked portion of the trocar to break the additional layer of tissue. She emphasized during the trial that never, at any point during the procedure, did she use the trocar spike.
Concluding that the incision was too large to contain any carbon dioxide that could be pumped with the Veress needle into the abdomen, defendant decided to convert the procedure into an "open laparoscopy." Contrary to a closed laparoscopy, in an open laparoscopy, sharp objects such as the Veress needle and trocar spike are not used once the initial incision is made with a scalpel. Rather, the laparoscope is placed directly in the trocar sleeve, and then both are introduced into the abdominal cavity together. During trial, defendant testified that she continued the procedure in this mannerby placing only the trocar sleeve and the laparoscope into plaintiff's abdomen. Defendant recorded her actions in an operative report, which stated: "The laparoscopic trocar was placed through the incision, the laparoscope through its sleeve, and under direct visualization it did appear to be in the peritoneal cavity." She then insufflated the abdomen with carbon dioxide through the trocar sleeve.
With respect to complications during the procedure, Dr. Amblo handwrote in the operative report: "Complication: on making skin incision fascia was incised, therefore, no Veress needle used. Trocar placed directly and pneumoperitoneum achieved through trocar sleeve." Dr. Amblo testified that this meant that she did not use the Veress needle to create the pneumoperitoneum, and instead used the trocar sleeve, to which she initially referred as only a trocar, to fill the abdominal cavity with carbon dioxide.
When plaintiff awoke in the recovery room, she was in pain which, although different from what she expected, was in the abdominal area just as defendant had described. She left the hospital on the same day as the surgery, thinking that the pain that she felt was normal for this type of procedure. As the evening progressed, the pain worsened, and plaintiff took some pain medication. The next day, plaintiff was very uncomfortable; she could not sit or lie down. She took more pain medication, which did not help. The following day, the pain was unbearable, and plaintiff was taken by an ambulance to Elizabeth General Hospital.
Plaintiff was basically in shock by the time that she arrived at the hospital. She had a distended abdomen, rapid pulse, and her blood pressure was low. The emergency room physician determined that she required emergency surgery. Ultimately, Dr. Peter Mlynarczyk, a general and vascular surgeon, placed plaintiff under general anesthesia and performed an exploratory laparotomy which revealed that plaintiff's stomach was traumatically ruptured. Because she had just had a laparoscopic procedure which generally involves a trocar, Dr. Mlynarczyk assumed that it was a trocar injury, and wrote in his operative report that "exploration ... of the upper abdomen revealed a trocar injury to the stomach along the greater curvature." Plaintiff's admission form, also signed by Dr. Mlynarczyk, described his principal diagnosis as a "[t]rocar injury to greater curvature of stomach anterior wall."
As a result of the perforation, gastric enzymes leaked from plaintiff's stomach into her abdominal cavity, causing peritonitis, an infection in the lining of the peritoneum. Dr. Mlynarczyk removed approximately two and one-half quarts of stomach fluid from plaintiff's abdomen. The bacterial infection, however, had already spread throughout plaintiff's body. After surgery, plaintiff was placed in the intensive care unit for three days. Once removed from intensive care, she remained in the hospital for about another two weeks. While in the hospital, plaintiff developed atelectasis of the lung (a condition involving pneumonia) and an obstructed bowel. Toward the end of her hospital stay, *1054 plaintiff had complaints of continued abdominal pain and coughing.
When she returned home, plaintiff developed a chronic cough and began to vomit constantly. During trial, plaintiff testified that, at first, the vomiting was associated with eating, explaining, "If I would eat something or drink something, my stomach got full, ... it would bother me and I would cough, and then I would throw up." Eventually, however, the coughing and vomiting occurred at any time. Plaintiff testified that prior to her tubal ligation and the ensuing emergency surgery, she did not have any difficulty breathing, nor did she have any choking or stomach problems. Currently, she is unable to gain weight and sometimes does not eat because she is afraid that she will regurgitate her food. According to plaintiff, activity causes the coughing fits, and she is unable to play with her children as she had prior to the operation and can no longer perform her usual household chores. Moreover, plaintiff has a large scar extending from her navel which irritates her.
Dr. Jeffrey Soffer, an expert in obstetrics and gynecology, testified at trial on plaintiff's behalf. Dr. Soffer was of the opinion that Dr. Amblo had deviated from the medically accepted standard of care in (1) making her initial incision too deep and/or (2) placing the trocar spike directly into plaintiff's abdomen prior to forming a pneumoperitoneum. Dr. Soffer concluded that the trocar spike was the most likely source of plaintiff's injuries, based on the operative reports of both defendant and Dr. Mlynarczyk.
Conversely, defendant testified that the injury could not have been caused by a trocar spike because she never used one during plaintiff's procedure. Defendant did, however, acknowledge that she made her initial incision too deep. According to defendant's experts, this was simply a risk of the surgery, and did not amount to negligence or malpractice.
After each side presented its proofs, the trial judge charged the jury with the following "exercise of judgment" instruction over plaintiff's objection:
Now, after deciding what the standard medical practice is in circumstances of this case, you must then determine whether the defendant has conformed with or deviated from the standard of care. In examining the conduct of a defendant physician to determine whether there was a deviation from an accepted standard of care, that is, whether she was negligent, you should understand that the law recognizes that the practice of medicine is not an exact science. Therefore, the law recognizes that the practice of medicine, according to acceptable medical standards, will not prevent a poor or unanticipated result. If a physician has applied the required knowledge, skill and care in the treatment of a patient, she is not negligent simply because a bad result has occurred. Likewise, where according to accepted medical practice, the manner in which treatment is conducted is a matter subject to the judgment of the physician, the physician must be allowed to exercise that judgment. The physician cannot be held liable if in the exercise of judgment, she has never the less made a mistake. Where judgment must be exercised, the law does not require of the doctor infallible judgment. Thus, a physician cannot be found negligent so long as she employs such judgment as is allowed by accepted medical standards. If, in fact, in the exercise of her judgment, the doctor selects one of two or more courses of action, each of which in the circumstances has substantial support or proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result. On the other hand, a doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself from the consequences by saying that it was an exercise of her judgment. Or, to state it in a different way, if in the exercise of a doctor's judgmentlet me back up. If the exercise of a doctor's judgment causes her to do that which standard medical practice forbids, the doctor would be negligent. Similarly, a doctor whose judgment causes her to omit doing something which is required by standard medical practice is also negligent. If you find that the defendant has complied with *1055 the accepted standard of medical care, then she is not liable to the plaintiff, regardless of the result. On the other hand, if you find that the defendant has departed from accepted medical standards, then you must determine whether such deviation or negligence was a proximate cause of any injury sustained by the plaintiff.
After beginning deliberations, the jury posed the following question:
Re: accepted standards of medical practice for a doctor, is judgment an element to be considered or are we limited only to evidence?
When asked to clarify, the jury responded: [C]an we consider a doctor's judgment as contributing or being a part of negligence?
The judge then re-read the charge above, over plaintiff's objection, informing the jury to "remember the charge as a whole and remember all of my charge and not pick out any particular part of my charge and place any undue emphasis upon it."
The above instruction essentially mirrors that provided in the Civil Model Jury Charges. Both the trial judge and defendant believed this charge was proper, reasoning that defendant exercised her judgment by deciding to convert to an open laparoscopy and directly inserting the trocar into plaintiff's abdomen after she realized that her initial cut was too deep.
On appeal, plaintiff argues that this charge was improper because defendant's choices during the procedure did not cause plaintiff's injuries. Rather, defendant's deviation lay in the manner in which the procedure was performed, either by making the initial skin incision too deep or inserting the trocar spike directly into plaintiff's abdomen without any insufflation. We agree.
The exercise of judgment instruction has been the source of considerable debate in our courts, as evidenced by the recent Supreme Court decision in Morlino v. Medical Center of Ocean County, 152 N.J. 563, 706 A.2d 721 (1997). Although the Court upheld the use of the instruction in Morlino, it recommended that the Committee on Model Charges review the charge, paying particular attention to the sentence, "The physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake." (152 N.J. at 575, 706 A.2d 721.) Justice Pollock explained that, taken out of context, this sentence could be interpreted to mean that an honest, but mistaken, exercise of judgment insulates the physician from liability for a mistake that violates the relevant standard of care. Id. at 589, 706 A.2d 721 (indicating that the word "mistake" connotes a deviation from the standard of care). When taken as a whole, however, the Court concluded that the charge was appropriate.
The charge is only appropriate, however, in instances where a surgeon selects one of two courses, "either one of which has substantial support as proper practice by the medical profession." Schueler v. Strelinger, 43 N.J. 330, 346, 204 A.2d 577 (1964). See Adams v. Cooper Hospital, 295 N.J.Super. 5, 8, 684 A.2d 506 (App.Div. 1996) (determining that the judgment rule did not apply to a nurse who exercised no judgment when she failed to monitor a patient for thirty minutes; the issue was only whether the nurse had a duty to constantly monitor the patient, not whether she used her judgment in timing the monitoring), certif. denied, 148 N.J. 463, 690 A.2d 610 (1997).
Defendant contends that the charge applied here because she chose "from among several accepted and recognized options in the method she employed at surgery." That is not so. Defendant's error dealt with the skill in which she performed the surgery. Accepting plaintiff's contention that defendant directly inserted the trocar spike into plaintiff's abdomen prior to insufflation, thereby puncturing plaintiff's stomach, we fail to see where defendant exercised any judgment. Admittedly, there is a third procedure for performing a laparoscopic tubal ligation referred to as the "direct trocar insertion" method. Under that method, the physician makes an initial incision with a scalpel in or directly below the navel. The trocar spike is then inserted directly into the incision, without the creation of a pneumoperitoneum. Defendant never argued, however, that it was her decision to use this method. Rather, she testified that her decision was to convert from a closed to an open *1056 laparoscopy, which requires that no sharp objects be placed in the incision. Thus, the trocar spike would not have been introduced into the abdominal cavity as a result of an exercise in judgment unless defendant actually decided to opt for the direct trocar insertion method, which she did not.
Even if we accept defendant's admission that she made her initial incision too deep, it is clear that she did not employ any judgment when she was incising the skin. It was not her intention to pierce all three layers of skin. Regardless of the method in which she performed the incision, either by elevating the skin prior to the initial incision or by simply holding the skin taut, she simply cut too deep. She did not use her judgment to determine the depth. If she had, she would have incised only the first two layers of skin. Her incision of the peritoneum was a mistake and cannot be considered an exercise of judgment.
The jury's questions honed in on the "exercise of judgment" charge. Rather than refine the charge by separating out what aspects of the surgery involved judgment and what did not, as was clearly required by the facts, the trial judge simply re-read the exercise of judgment charge. His doing so constituted reversible error. We believe that the jury outcome could very well have been different if they were correctly instructed and, consequently, we reverse.
In light of our decision to reverse and remand for a new trial, we see no need to address plaintiff's remaining arguments. We find it necessary, however, to express our disapproval of the trial judge's attempt to identify with the jury by stressing that counsel limit repetitive questions of an expert witness because both he and the jury knew enough about the procedure to "open up [a] laparoscopic boutique." He continued:
We know enough about this surgery, we know enough about what went on, we know what your allegations are, we know what the reports say, we know what was done and what wasn't done, what could have been done, ... what everybody says, we know all that stuff. And what we'd really like to do.
These sarcastic comments, made in the jury's presence, were demeaning of counsel and his representation of plaintiff. Although counsel was experienced and obviously not one to be easily intimidated, the trial judge should have been more sensitive to the effect that his comments may have had on the jury's perception of the attorney and on plaintiff's case. The proper way to limit cross-examination is to simply tell counsel to "move on," warn that the questions are becoming repetitive or, if necessary, hold a sidebar to admonish counsel outside the jury's hearing.
Reversed and remanded for a new trial.