751 A.2d 102

DIANA VELAZQUEZ, AN INFANT·BY HER GUARDIAN AD LITEM, BARBARA VELAZQUEZ AND BARBARA AND LUIS VELAZQUEZ, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. RONALD PORTADIN, M.D., NEWCOMB MEDICAL CENTER, EILEEN CINOTTI–MAGEE, R.N., ANN SPOLTORE, R.N. AND VINELAND OBSTETRICAL & GYNECOLOGICAL PROFESSIONAL ASSOCIATES, DEFENDANTS–RESPONDENTS, AND DR. MICHELLE TORCHIA, M.D., JOHN DOES, M.D.'S (FICTITIOUS NAMES), PATRICIA KNECHT, R.N., JANE ROES, R.N.'S (FICTITIOUS NAMES), ROBERT SMITHS (FICTITIOUSLY NAMED HEALTH CARE PROVIDERS), DEFENDANTS.

Argued January 19, 2000—Decided May 18, 2000.

678

*Carol L. Forte* argued the cause for appellants (*Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte,* attorneys).

*Melvin Greenberg* argued the cause for respondents Ronald Portadin, M.D. and Vineland Obstetrical & Gynecological Professional Associates (*Greenberg, Dauber & Epstein,* attorneys).

*Richard A. Grossman* argued the cause for respondents Newcomb Medical Center and Eileen Cinotti–McGee, R.N. (*Grossman, Kruttschnitt, Heavey & Jacob,* attorneys; *Roberta DiBiase,* on letter brief).

*Timothy M. Crammer* argued the caused for respondent Ann Spoltore, R.N. (*Paarz, Master, Koernig, Crammer, O'Brien, Bishop & Horn,* attorneys).

The opinion of the court was delivered by

LONG, J.

This case presents another chapter in the continuing saga of the medical judgment charge. Plaintiffs, Barbara and Luis Velazquez, instituted a medical malpractice action against Dr. Ronald Portadin, Vineland Obstetrical & Gynecological Professional Association, and Nurses Eileen Cinotti and Ann Spaltore (collectively defendants).[1] Plaintiffs alleged that defendants failed to adhere to the accepted standard of medical care in connection with their daughter Diana's birth, resulting in severe injury to her (cerebral palsy). More particularly, the complainants alleged that defendants had deviated from accepted standards while administering the drug Pitocin to Barbara Velasquez insofar as they negligently monitored Diana's fetal heart beat readings and, as a result, failed to timely discontinue the drug, causing Diana to be deprived of oxygen. Defendants answered, denying the allegations of the complaint. Discovery ensued and the case went to trial.

---

[1] Dr. Michelle Torchia and Nurse Patricia Knecht were originally named as defendants and later dismissed by stipulation.

*I*

The facts established at trial were as follows: At about 2:00 a.m. on August 18, 1990, Mrs. Velazquez came to Newcomb Medical Center to deliver her first child after an uneventful pregnancy. When she first arrived at the hospital, she was cared for by Dr. Michelle Torchia, the physician covering for Vineland Obstetrical Associates. Shortly after admission, electronic monitoring of the fetal heart began. That monitoring is carried out by placing a belt containing a transducer around the mother's abdomen. The monitor produces a continuous paper strip. The baby's heartbeat is printed along the top of the strip, and the pattern of the mother's uterine contractions is printed simultaneously along the bottom. The information on the strip allows the reader to examine the fetal heart rate and how it responds to contractions. The relationship between the two may demonstrate problems that the baby may be having.

Dr. Portadin relieved Dr. Torchia at 8:00 a.m. At that time, Eileen Cinotti, R.N., and Ann Spoltore, R.N., began to care for Mrs. Velazquez. Nurse Cinotti, as the primary nurse, was responsible for monitoring Mrs. Velazquez during labor. Nurse Spoltore was the nurse designated to care for the baby after delivery.

At approximately 1:30 p.m., Dr. Portadin determined that a drug called Pitocin should be given to increase uterine contractions and to assist in the descent of the baby down the birth canal. Pitocin is a medication used to increase the intensity and frequency of uterine contractions in women whose contractions are insufficient to deliver the baby. If Pitocin causes the contractions to occur too frequently or last too long, the baby may be harmed because blood flow to the baby slows during contractions. That condition is called hyperstimulation of the uterus. When the uterus is hyperstimulated, the interval between contractions is shortened and there is not enough time for the baby to catch up on its oxygen needs before the start of another contraction. That is why constant monitoring is required.

Shortly after 1:30 p.m., Cinotti, the nurse on duty in the hospital's labor room, began the intravenous infusion of Pitocin at the rate of two milliunits per minute. Soon the fetal monitor strip began to decrease in readability. At about 1:45 p.m., Cinotti increased the Pitocin rate to four milliunits per minute. At about 2:24 p.m., Cinotti was relieved by Spoltore as the nurse on duty in the labor room so that Cinotti could prepare the adjacent delivery room for Mrs. Velazquez. At that time, the Pitocin rate was increased to six milliunits per minute.

At 2:45 p.m., Mrs. Velazquez was disconnected from the fetal monitoring belt and, at about 2:55 p.m., she was transferred to the delivery room. Although defendants claim Mrs. Velazquez was monitored again when she reached the delivery room, those monitor strips are missing. At 3:02 p.m., while still receiving Pitocin, Mrs. Velasquez vaginally delivered Diana. At birth, Diana had virtually no heartbeat and, following resuscitation, was diagnosed as having cerebral palsy.

Plaintiffs presented experts who testified that Diana's problems were due to birth asphyxia. They found no other explanation for her condition. They based their conclusion upon a multitude of evidence, including Diana's blood acidity, her susceptibility to seizures, and her breathing problems. Subsequent health care providers also diagnosed birth asphyxia, and neuroimaging studies were consistent with that diagnosis. The plaintiffs' experts concluded that the oxygen deprivation had occurred within the last one and one-half hours before birth, which was the same time that the Pitocin was being administered. Defendants also presented experts who testified in detail that the genesis of cerebral palsy is unknown and that plaintiffs' contention that it is caused by asphyxia at birth is only a theory.

At trial, all of the experts agreed that it was appropriate for Dr. Portadin to augment Mrs. Velazquez's contractions with Pitocin and that monitoring was necessary. However, the experts disagreed strenuously about whether monitoring, in fact, took place and, more particularly, whether the strips were sufficiently reada-

ble to allow defendants to determine Diana's reaction to the Pitocin induced contractions.

In brief, plaintiffs' medical experts testified that because of the risks of Pitocin, constant fetal monitoring is required and there is no evidence in this record that the fetal monitor was read. There is nothing in the hospital chart to indicate that Dr. Portadin saw Ms. Velasquez or monitored the tape between the administration of the Pitocin and the delivery. Nor is there a single notation on the chart indicating that anyone knew that the strips were unreadable or that they showed fetal distress, although Nurse Cinotti claimed at trial that she advised Dr. Portadin that the strips revealed a problem. According to plaintiffs' experts, starting at 1:30 the strips were too intermittent to be read and, to the extent that anything could be gleaned from them, it was fetal heart deceleration.

Plaintiffs' experts were of the opinion that when the strips became unreadable, the nurses should have discontinued the drug and notified Dr. Portadin so that he could determine what course of action to take. According to those experts, Dr. Portadin violated the standard of care by continuing the Pitocin. Among his options were discontinuing the drug until reassuring tracings resumed, or applying an internal fetal monitor to Diana's scalp and reinstituting Pitocin when those readings were more reassuring. Either option, according to plaintiffs' expert, would have avoided Diana's injury. If the monitor strips were readable and were read, the defendants would have seen that Diana was in distress and resuscitated her in the womb. Although there were some infection risks with the internal scalp monitor, stopping the Pitocin would have caused no risk.

Dr. Portadin testified on his own behalf. He could not remember the events surrounding Diana's birth. Thus, he testified as to his normal procedure. He agreed that once Pitocin is administered, some monitor must be in place. However, he cautioned that whether or not to use an internal scalp monitor is a medical judgment; one must examine the information at hand and consid-

er the potential of infection in using a scalp monitor. Dr. Portadin stated that his standard practice is to weigh the costs and benefits of using an internal fetal monitor.

Dr. Portadin disagreed with plaintiffs' experts' interpretation of the monitor strips. Specifically, he testified that there was nothing in the strips that indicated that Diana was experiencing difficulty. He continued administering the Pitocin so that Mrs. Velazquez could spontaneously deliver the baby. Dr. Portadin testified that alternative methods of delivery would take longer than spontaneous delivery. Therefore, by the time the external monitor was not picking up as well as it had been, other delivery options were foreclosed by the passage of time and the risk-benefit analysis. Dr. Portadin stated that it was his procedure to stay with the patient for ten to fifteen minutes after administration of Pitocin and to check her every fifteen to twenty minutes thereafter.

Dr. Kenneth Dollinger, Dr. Portadin's obstetrical expert, and Dr. John Harrison, the nurses' expert, agreed that if the strips were unreadable, Pitocin should have been discontinued. However, both stated that the strips overall were readable, that any unreadable portions were followed by reassuring tracings and that they did not reveal any fetal distress. Dollinger further stated that by the time Mrs. Velazquez was fully dilated in the late stages of labor, it did not matter whether or not she was monitored because natural delivery was imminent and any alternate means of delivery posed a greater risk than proceeding with the delivery as planned. He also testified as to risks attendant upon use of the fetal scalp monitor.

At the close of trial, and over the objection of plaintiffs' counsel, the trial court gave a charge based on the Model Jury Charge on exercise of judgment, *Model Jury Charge 5.36A (Civil),* 2 Medical Malpractice, Duty and Negligence (May 1997):

[Y]ou should understand that the law recognizes that the practice of medicine and the practice of nursing are not exact sciences. Therefore, the law recognizes that the practice of medicine or nursing according to accepted medical or nursing standards will not always prevent a poor or [un]anticipated result. If the physician

or nurse has applied the required knowledge, skill, and care in the diagnosis and treatment of the plaintiff, he or she is not negligent simply because a bad result has occurred. Likewise, where according to accepted medical or nursing practice the manner in which the diagnosis or treatment is conducted is a matter subject to the judgment of the physician or nurse, the physician or nurse must be allowed to exercise that judgment. Where a judgment must be exercised, the law does not require the doctor or nurse [to be] infallible.... Thus, a physician or nurse cannot be found negligent so long as he or she employs such judgment as is allowed by ... accepted medical or nursing practice. If, in fact, in the exercise of his or her judgment, a doctor or nurse selects one or two or more courses of action each of which in the circumstance has substantial support as proper practice by the medical or nursing profession, the doctor or nurse cannot be found negligent if the course chosen produces a poor result.

The jury was instructed to return its verdict by answering a multi-question verdict sheet. The jury began its deliberations on September 24, 1997, at 3:40 p.m. and returned twenty minutes later with its verdict. The jurors unanimously answered "no" to verdict sheet questions 1, 3, and 5:

1. Did Ronald Portadin deviate from accepted standards of medical practice?

3. Did Nurse Eileen Cinotti deviate from accepted standards of nursing practice?

5. Did Nurse Ann Spoltore deviate from accepted standards of nursing practice?

Verdict sheet questions 2, 4, and 6 were not answered because they dealt with proximate cause.

Plaintiffs filed a notice of appeal. The Appellate Division affirmed. *Velazquez v. Portadin,* 321 *N.J.Super.* 558, 729 *A.*2d 1041 (App.Div.1999). We granted plaintiffs' petition for certification on September 22, 1999. 162 *N.J.* 130, 741 *A.*2d 98 (1999).

Plaintiffs' main argument on appeal is that the improperly tailored instruction on the medical judgment charge constituted error. They also contend that they were prejudiced by the way that the trial court conducted the *voir dire.* We agree with plaintiffs that the trial court's failure to untangle the facts in relation to the medical judgment charge left the jury free to excuse defendants based on the evidence of judgment in areas where no judgment was exercised. Because that error was not harmless, a new trial is necessary.

## II

A physician must act with that degree of care, knowledge, and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field. *Walck v. Johns–Manville Prods. Corp.*, 56 *N.J.* 533, 560, 267 *A.2d* 508 (1970). Model Jury Charge 5.36A, which governs medical malpractice actions, articulates that governing standard of care: "A person who is engaged in the general practice of medicine represents that he/she will have and employ knowledge and skill normally possessed and used by the average physician practicing his/her profession as a general practitioner." *Model Jury Charge 5.36A (Civil )*, *supra*, at 2. That standard, "recognizing that 'medicine is not an exact science,' holds physicians responsible for their negligence without making them guarantors of the health of their patients." *Aiello v. Muhlenberg Reg'l Med. Ctr.*, 159 *N.J.* 618, 626, 733 *A.2d* 433 (1999)(quoting *Schueler v. Strelinger*, 43 *N.J.* 330, 344, 204 *A.2d* 577 (1964)).

In *Schueler*, we recognized that "good treatment will not necessarily prevent a poor result." *Schueler*, *supra*, 43 *N.J.* at 344, 204 *A.2d* 577. "[W]hen a surgeon selects one of two courses . . . either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued." *Id.* at 346, 204 *A.2d* 577. That is so because when "a matter [exists] about which there are differing schools of medical opinion[,] . . . the plain inference is that the matter must be left to the good faith judgment of the experienced attending surgeon." *Ibid.* That notion has been incorporated into the exercise of judgment instruction portion of the Model Charge. However, the physician will be held negligent if his or her action "represent[s] a departure from the requirements of accepted medical practice[.]" *Schueler*, *supra*, 43 *N.J.* at 345, 204 *A.2d* 577. Because the distinction between the "exercise of judgment" and a deviation from accepted practice is sometimes complicated, the Model Charge was amended to provide that

doctors may not rely on the "exercise of medical judgment" to avoid liability for ordinary negligence:

[A] doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself/herself from the consequences by saying that it was an exercise of his/her judgment. Or, to state it a different way, if the exercise of a doctor's judgment causes him/her to do that which standard medical practice forbids, the doctor would be negligent. Similarly, a doctor whose judgment causes him/her to omit doing something which is required by standard medical practice is also negligent.

[*Model Jury Charge 5.36A (Civil), supra,* at 5–6.]

Given the relationship between medical judgment and the standard of care, our courts have often struggled in determining whether the facts of a particular case call for the application of the judgment charge. We have generally limited the application of the judgment charge to medical malpractice actions concerning misdiagnosis or the selection of one of two or more generally accepted courses of treatment. *Aiello, supra,* 159 *N.J.* at 628–29, 733 *A.*2d 433; *see Patton v. Amblo,* 314 *N.J.Super.* 1, 9, 713 *A.*2d 1051 (App.Div.1998)(finding that doctor was not entitled to "exercise of judgment" charge where alleged malpractice involved making scalpel incision too deep because alleged deviation was in manner doctor performed procedure); *Adams v. Cooper Hosp.,* 295 *N.J.Super.* 5, 10–11, 684 *A.*2d 506 (App.Div.1996)(holding that court did not err by refusing to charge jury with "exercise of judgment" instruction where issue was whether nurse had duty to constantly monitor patient because case did not involve selection between one of two courses of treatment or two schools of thought), *certif. denied,* 148 *N.J.* 463, 690 *A.*2d 610 (1997).

Indeed, the Model Charge itself is facially limited to cases in which the physician exercised judgment in selecting among acceptable courses of action:

If ... in the exercise of his/her judgment a doctor selects one of two or more courses of action, each of which in the circumstances has substantial support as a proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result.

[*Model Jury Charge 5.36A (Civil), supra,* at 5.]

■ It is fundamental that "[a]ppropriate and proper charges to a jury are essential for a fair trial." *State v. Green*, 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981). Jury charges "must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them...." *Jurman v. Samuel Braen, Inc.*, 47 *N.J.* 586, 591–92, 222 *A.*2d 78 (1966); *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 570, 512 *A.*2d 507 (App.Div.), *certif. denied*, 107 *N.J.* 48, 526 *A.*2d 138 (1986). Pursuant to those principles, a trial court must not only administer the exercise of judgment charge solely in cases where the charge is appropriate, but it must also separate out those aspects of the medical care that involved judgment and those that did not. *Patton*, *supra*, 314 *N.J.Super.* at 8–9, 713 *A.*2d 1051. The failure to do so constitutes reversible error where the jury outcome might have been different had the jury been instructed correctly. *Id.* at 10, 713 *A.*2d 1051.

■ It is often difficult to determine what evidence must be presented in order to entitle a defendant to the exercise of judgment charge. However, that is an important determination because "[i]f the exercise of judgment rule is inappropriately or erroneously applied in a case that involves only the exercise of reasonable care, the aspect of the rule that excuses physicians for 'mistakes' would enable the physician to avoid responsibility for ordinary negligence." *Aiello*, *supra*, 159 *N.J.* at 632, 733 *A.*2d 433. In other words,

> [t]he "mistake" that inheres in negligence, that is, failure to exercise reasonable care, is not the kind of mistake that is excusable. If, therefore, the physician's professional conduct implicates only the exercise of reasonable care in the performance of a medical procedure and not the exercise of medical judgment in selecting among acceptable and medically reasonable courses of treatment, the medical judgment rule should not be invoked.
>
> [*Ibid.*]

That point is driven home in a footnote to the most recent Model Charge:

> If a case does not involve a legitimate judgment call or two schools of thought, then the Trial Judge should omit this portion of the charge. See *Adams v. Cooper*

*Hospital,* 295 *N.J.Super.* 5, 8, 684 *A.*2d 506 (App.Div.1996). If a case involves judgment issues on some theories of liability, but not on others, the charge should be tailored to those facts. *Patton v. Amblo,* 314 *N.J.Super.* 1, 713 *A.*2d 1051 (App.Div.1998), (trial judge committed reversible error when he failed to separate out what aspects of care involved judgment and which did not) and see *Campos v. Firestone Tire and Rubber Company,* 98 *N.J.* 198, 210, 485 *A.*2d 305 (1984). Medical malpractice practitioners should assist the court in framing tailored, objective statements of those issues which do involve legitimate dispute issues of judgment or two schools of thought. To give one example among many, if a distinct issue in a case involved a doctor who ordered a test and never received the result, the jury would appropriately be charged that there was no exercise of judgment or two schools of thought defense to that claim. In contrast, what steps to take in response to a test result might involve one or more issues of judgment.

[*Model Jury Charge 5.36A(Civil),* 2 Medical Malpractice, Duty and Negligence (April 1999).]

Here, the trial court failed to tailor the charge to the theories and facts presented. First, he neglected to explain that it was the jury's duty to determine whether the defendants, in fact, monitored Mrs. Velazquez at all while she was on Pitocin. All experts agreed that monitoring was required and that if it was not done, it was a deviation from the standard of care. There was evidence from which the jury could have concluded that defendants failed to monitor Mrs. Velazquez and that the reason they did not take action when the strips became unreadable was that they were unaware of it. That issue had to be presented to the jury as involving a deviation from the standard of care without reference to the judgment charge.

Second, the issue of whether the strips were readable was not a judgment call. Experts testified on both sides as to the standard for readability. It was for the jury to decide which standard was correct and to determine whether there was a deviation. The judgment charge was thus inapplicable to that aspect of the case.

Third, if the jury found that the strips were not readable, and no other meaningful monitoring technique was in place, all experts agreed that the Pitocin should have been stopped. That was not a judgment issue.

Fourth, if the jury found the strips were, in fact, readable, the issue was whether they revealed fetal distress. If there was no

fetal distress, no action was required. If fetal distress was evident, the issue was whether continuing the Pitocin without remedying that distress comported with the standard of care. Again, no judgment was required.

The defense experts emphasized the fact that by 2:30 to 2:45 it was too late to deliver Diana any other way but vaginally. Assuming that was correct, the judgment charge was inapplicable for that very reason—defendants had no choice at that point. Moreover, that determination could not insulate defendants from liability because plaintiff's theory was that it was the failure to monitor from 1:30 onward that violated the standard of care and caused the later predicament.

The only issue of judgment was whether to utilize an internal monitor because that decision apparently involved choosing between two equally acceptable approaches. In short, the bulk of this case implicated the question of deviation from the standard of care, not judgment. The able defense lawyers, knowing the power of the judgment charge, took every opportunity to lead the court and jury into thinking that the entire case revolved around the exercise of judgment. It did not. Although one or possibly a few judgment issues may have been implicated, the heart of the case was about whether there was a deviation from the standard of care. The undifferentiated instruction on medical judgment misled the jury and thus improperly insulated defendants from liability.

We engaged in a rather painstaking factual analysis here to reaffirm for trial judges the nature of the inquiry that is essential when a medical judgment charge is at issue. Court and counsel should analyze the parties' testimony and theories in detail, on the record, to determine whether the charge is applicable at all and, if so, to which specific issues. The charge should then be tailored accordingly. Only such an approach will avoid the error that occurred in this case.

Because the judgment charge was not tailored to the facts of this case, its coverage was overbroad and had the potential to

improperly insulate defendants from liability. Accordingly, a new trial is required.

## III

Although the ordering of a new trial makes it unnecessary for us to grapple with plaintiffs' complaints about the *voir dire,* we take this opportunity to make several observations. The first is in connection with plaintiffs' application for additional peremptory challenges.

Plaintiffs contend that under *Rule* 1:8–3(c) they were entitled to additional peremptory challenges beyond the six granted under normal circumstances because defendants had eighteen peremptory challenges between them and a substantial identity of interest in one or more issues.

*Rule* 1:8–3(c) provides:

In civil actions each party shall be entitled to 6 peremptory challenges. Parties represented by the same attorney shall be deemed 1 party for the purposes of this rule. Where, however, multiple parties having a substantial identity of interest in one or more issues are represented by different attorneys, the trial court in its discretion may, on application of counsel prior to the selection of the jury, accord the adverse party such additional number of peremptory challenges as it deems appropriate in order to avoid unfairness to the adverse party.

The reason for the rule is that when there is a substantial disproportion between the number of plaintiff's peremptory challenges, and the collective peremptory challenges of the defendants, the "[p]laintiff is thus placed at an extreme disadvantage in the rejection of prospective jurors ... [and the] right to have [the] case heard by an impartial panel is severely compromised...." *George v. Bergen Pines County Hospital,* 217 *N.J.Super.* 548, 551, 526 *A.*2d 293 (Law Div.1987).

Here, plaintiffs used all available challenges and were nonetheless dissatisfied with the jury. Thus, the fundamental requirement for seeking extra peremptory challenges was met. *Russell v. Rutgers Community Health Plan, Inc.,* 280 *N.J.Super.* 445, 456, 655 *A.*2d 948 (App.Div.1995), *certif. denied,* 142 *N.J.* 452, 663 *A.*2d 1359 (1995). The trial court cursorily found that the defendants

"had individual clients with individual theories presented against them," and denied the additional challenges.

Although the grant or denial of extra peremptory challenges under *Rule* 1:8–3(c) is a matter of discretion, that does not mean that it may be an arbitrary exercise. On the contrary, the court is required to analyze the positions of the multiple parties for identity purposes to determine whether the adversary will be prejudiced unless more peremptory challenges are awarded.

Here, the trial court failed to address the substantial identity of interests of these defendants. All three defended the case on the basis of the exercise of judgment; the unknown etiology of cerebral palsy; the claim that Mrs. Velasquez constantly was monitored while on Pitocin; the claim that the monitor strips were readable; and the claim the information revealed by the strips gave defendants no reason to stop the Pitocin or otherwise intervene. What was required of the trial court was a focus on the specific facts and theories of the parties, followed by a reasoned judgment about the identity of their interests and the need for plaintiffs to be awarded additional peremptory challenges.

Because the case must be retried, we need not pass on the effect of the denial of the extra challenges. This much is clear however: when a request is made for additional peremptory challenges under *Rule* 1:8–3(c), the lawyers and the court must parse out the theories of the parties in detail for the record so that an identity determination can be made. Merely concluding that there is or is not such an identity is inadequate; a statement of reasons for ruling is required.

## IV

The judgment of the Appellate Division is reversed. The case is remanded to the Law Division for a new trial consistent with the principles stated.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.