**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4790-15T2

S.W.K., Individually and as
Administratrix Ad Prosequendum
of the ESTATE OF J.B.K.,

      Plaintiff-Appellant,

v.

ATLANTIC HEALTH SYSTEM, INC.,
MORRISTOWN MEDICAL CENTER,
EMERGENCY MEDICAL ASSOCIATES
OF NEW JERSEY, PA, STEVEN P.
GOHSLER, M.D., and ALFREDO
TAPIA, M.D.,

      Defendants-Respondents.

_____

S.W.K., Individually and as
Administratrix Ad Prosequendum
of the ESTATE OF J.B.K.,

      Plaintiff-Appellant,

v.

MORRISTOWN MEDICAL CENTER,
EMERGENCY MEDICAL ASSOCIATES
OF NEW JERSEY, PA, EMERGENCY

MEDICAL ASSOCIATES/CHS, LLC,
EDIMS, LLC, ANN GRISWOLD, R.N.,
RICHARD KLEMM, R.N., GERY
MCKENNA, R.N., BRAD ROBBINS, R.N.,
and KATHLEEN GRABIANOWSKI, R.N.,

    Defendants-Respondents.

Argued October 30, 2018 – Decided December 19, 2018

Before Judges Rothstadt, Gilson, and Natali.

On appeal from Superior Court of New Jersey, Law Division, Morris County, Docket Nos. L-2862-11 and L-2546-12.

Stewart M. Leviss argued the cause for appellant (Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross, LLC, attorneys; Stewart M. Leviss, on the briefs).

Anthony Cocca argued the cause for respondents Alfredo Tapia, M.D., Atlantic Health System, Inc., Morristown Medical Center, Ann Griswold, R.N., Richard Klemm, R.N., Gery McKenna, R.N., Brad Robbins, R.N., and Kathleen Grabianowski, R.N., (Cocca & Cutinello, LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the brief).

Russell J. Malta argued the cause for respondents Steven P. Gohsler, M.D., and Emergency Medical Associates of New Jersey, PA (Orlovsky, Moody, Schaaff, Conlon & Gabrysiak, attorneys; Paul F. Schaaff, Jr., of counsel; Russell J. Malta, on the brief).

PER CURIAM

2

This appeal arises out of a medical malpractice action following the death of a patient. Plaintiff, who is the widow and administratrix of the decedent's estate, contended that several doctors and nurses were negligent in failing to diagnose and treat decedent for deep vein thrombosis, which thereafter caused decedent to die from a pulmonary embolism.

Following a trial, the jury found that none of the defendants breached their relevant standards of care. Plaintiff appeals from the judgment memorializing that verdict, from several pre-trial orders, and from a post-trial order denying her motion for a new trial. She makes two primary arguments, contending the trial court (1) failed to provide an appropriate jury charge on the issue of avoidable consequences; and (2) erred in making several rulings on her claims of evidence spoliation. Having reviewed the record and law, we affirm.

I

The decedent, J.B.K.,[1] twice came to the emergency room at Morristown Medical Center (MMC). He first came to the emergency room on July 2, 2010, with complaints of pain and swelling behind his left knee. J.B.K. reported that his symptoms developed after he flew from Minneapolis to Newark and he had

---

[1] Because the appeal involves a discussion of medical issues, we use initials to protect the privacy interests of decedent and his family.

 A-4790-15T2

not suffered any trauma to his knee. J.B.K. was seen by several nurses and examined by the attending emergency room physician, Dr. Steven P. Gohsler.

Dr. Gohsler testified that complaints of knee pain after long plane travel can be indicative of deep vein thrombosis, a condition where a blood clot forms in a patient's vein. Dr. Gohsler went on to testify, however, that he believed J.B.K.'s clinical presentation was inconsistent with deep vein thrombosis. After speaking with J.B.K. and taking a history, Dr. Gohsler diagnosed J.B.K. with "atraumatic knee effusion." The doctor then directed J.B.K. to take over-the-counter analgesics, restrict his activity, and follow up with both an orthopedist and his primary care physician.

On September 29, 2010, J.B.K. returned to the emergency room complaining of pain in his lower back and left side radiating up to his left shoulder. J.B.K. reported that he had lifted a heavy table a few days earlier. He also stated that he was having shortness of breath when inhaling and felt pain when he took deep breaths. On his second visit to the emergency room, J.B.K. was seen by several nurses and examined by Dr. Alfredo Tapia, a resident, who conducted the examination under the supervision of Dr. Gohsler. The doctors ordered a chest x-ray and interpreted the x-ray as showing a nodule in J.B.K.'s right lower lung lobe. They testified that they directed J.B.K. to follow up with

his primary care physician concerning that observation. Both doctors also testified that they considered the possibility that J.B.K.'s symptoms were caused by a pulmonary embolism, but they ruled that diagnosis out.

Dr. Tapia diagnosed J.B.K. with back strain and prescribed pain medication and also directed him to use an incentive spirometer to encourage deeper breathing. Drs. Tapia and Gohsler testified that they believed J.B.K.'s pain on inhalation was related to his back and side pain, which in turn was caused by strain. Dr. Tapia went on to testify that he personally gave J.B.K. discharge instructions and directed him to follow up with his primary care physician in one or two days and to return to the emergency room if his symptoms worsened. Dr. Tapia's handwritten discharge summary read "follow up with [primary medical doctor] in 1-2 days for worsening symptoms," with the final three words crossed out. At trial, Dr. Tapia confirmed that he crossed out the words "for worsening symptoms."

Both Drs. Tapia and Gohsler testified that they instructed J.B.K. to see his primary care physician within a few days of leaving the emergency room. J.B.K. was also given written aftercare instructions, which were reviewed with him. Those instructions included a statement that J.B.K. was to "follow up with private MD in 2-3 days[,] return to emergency room if condition worsens[.]"

After J.B.K. left the hospital, a radiologist reviewed his chest x-ray and issued a report identifying not only the right lung nodule, but also "left lung base infiltrate." Dr. Gohsler testified that after reviewing that report, he made several unsuccessful attempts to call J.B.K.

At trial, it was undisputed that J.B.K. did not follow up with his primary care physician in the recommended timeframe. On October 12, 2010, J.B.K. collapsed and, thereafter, he was pronounced dead. An autopsy identified the cause of death as pulmonary thromboembolism.

Following J.B.K.'s death, plaintiff filed negligence claims against the two doctors and five nurses who had treated J.B.K. at the emergency room at MMC. The complaint also named as defendants: MMC, Atlantic Health Systems, Inc. (AHS), and Emergency Medical Associates of New Jersey (EMA), which is the medical practice group where Dr. Gohsler works.

Plaintiff alleged that the two doctors and five nurses were negligent and committed medical malpractice in treating J.B.K. She also claimed that they caused his wrongful death. She asserted that MMC, AHS, and EMA were vicariously liable for the doctors' and nurses' actions. In addition, she claimed negligent infliction of emotional distress. Finally, she asserted a claim that

A-4790-15T2

defendants failed to preserve all of J.B.K.'s medical records and altered or amended J.B.K.'s medical records to conceal their negligence and malpractice.

Before trial, the court granted partial summary judgment to defendants dismissing certain of plaintiff's claims. In that regard, on February 20, 2015, the court entered orders granting partial summary judgment to defendants and dismissed plaintiff's individual emotional distress claims. On February 19, 2016, the court granted defendants' motion for partial summary judgment dismissing plaintiff's spoliation claims.

At trial, plaintiff presented expert testimony contending that the doctors and nurses who treated J.B.K. breached their duties of care by failing to diagnose his deep vein thrombosis and pulmonary embolism. Defendants presented counter experts who testified that the doctors and nurses complied with their duty of care.

Following the close of evidence, the trial court instructed the jury on the law. In describing damages, the court gave an instruction on avoidable consequences. The court did not, however, expressly instruct the jury that they were not to consider comparative negligence or avoidable consequences as it related to the issue of liability. Thereafter, the jury found that none of the defendants had breached their duty of care.

A-4790-15T2

The jury verdict was memorialized in a judgment entered on April 5, 2016. Plaintiff made a motion for a new trial, but the court denied that motion in an order entered on June 7, 2016. Plaintiff now appeals.

II

On appeal, plaintiff challenges the trial court's jury instructions and its rulings on her spoliation of evidence claim. With regard to the jury charge, plaintiff argues that the trial court failed to give a limiting instruction directing the jury not to consider J.B.K.'s post-treatment conduct when evaluating defendants' alleged malpractice. On spoliation, plaintiff makes three related arguments. She contends that it was improper to (1) grant partial summary judgment dismissing her spoliation claim ten days before trial; (2) restrict her from eliciting evidence concerning spoliation during trial; and (3) deny her request for an instruction on an adverse inference due to spoliation. We are not persuaded by any of these arguments. We discern no reversible error in the jury instructions and the rulings on spoliation were consistent with the facts and the law.

A.    The Jury Instructions

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677,

688 (2000) (alternation in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)).  "[A] jury charge must correctly state the applicable law, outline the jury's function and be clear in how the jury should apply the legal principles charged to the facts of the case at hand."  Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002) (citing Velazquez, 163 N.J. at 688).  An incorrect jury charge, however, does not automatically warrant reversal; rather, reversal is appropriate "only if the jury could have come to a different result had it been correctly instructed."  Ibid. (citing Velazquez, 163 N.J. at 688).  In evaluating jury instructions, we "examine the charge as a whole, rather than focus on individual errors in isolation."  Ibid. (citing Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 137 (3d Cir. 1997)).

Here, plaintiff alleged medical malpractice against the doctors and nurses who treated J.B.K. when he visited the emergency room on two occasions in July and September 2010.  At trial, the defense focused on J.B.K.'s post-treatment conduct, contending that J.B.K. failed to follow up with his primary care physician or return to the emergency room when his condition worsened.

During the charge conference, plaintiff's counsel expressed concern that defendants had presented J.B.K.'s post-treatment failures as if they constituted comparative negligence.  The trial court correctly agreed that comparative

negligence did not apply. Accordingly, the trial judge stated that he would instruct the jury on avoidable consequences.

In issuing instructions to the jury, the trial judge first explained what plaintiff needed to prove to establish that the medical professionals involved in J.B.K.'s care were negligent. Thus, the judge instructed the jury on the concepts of standard of care, deviation therefrom, and proximate cause. The judge then instructed the jury on plaintiff's burden of proof as to damages. At the end of the damages instruction, the judge stated:

> If you decide that the plaintiff is entitled to damages for [J.B.K.'s] injuries and death, which means that, in effect, you have decided that a defendant or defendants are responsible, you must then decide whether [J.B.K.] exercised reasonable care to avoid or mitigate the damages he suffered.

The judge then outlined defendants' arguments that if J.B.K. had followed up with his primary care physician or sought further treatment, he may have survived. Accordingly, the judge instructed the jury:

> In short, you must decide what percentage, if any, of [J.B.K.'s] damages were caused by a failure on his part to exercise reasonable care to avoid or mitigate those damages.
> If he was capable of exercising reasonable care to avoid or mitigate the injury, you must reduce his damages accordingly. So, if you find that the plaintiff has established that one or more of the defendants were negligent, you first would have to find that, and that the

negligence proximately caused the harm, then the defendant must prove by a preponderance of the evidence that [J.B.K.] could have reasonably acted to avoid or mitigate injury.

The judge went on to instruct the jury that if it found that J.B.K. failed to avoid or mitigate his damages, the jury must "allocate, by percentages," defendants' and J.B.K.'s relative responsibility for J.B.K.'s death.

The judge further clarified the instructions by reviewing the verdict sheet with the jury. The verdict sheet first asked the jury to determine whether each defendant breached his or her relevant standard of care and proximately caused J.B.K.'s death. The verdict sheet, thereafter, asked whether J.B.K. contributed to his death "by failing to obtain medical care, as instructed; return[ing] to the hospital if his symptoms changed or worsened; or otherwise failing to act reasonably with regard to his health[.]" If the jury so found, the verdict sheet asked the jurors to "[s]et forth, in terms of percentage, that portion of the plaintiff's . . . injury" that occurred due to J.B.K.'s conduct.

Those instructions correctly outlined the applicable law to the factual contentions put forward by the parties. In that regard, the instructions directed the jury first to determine defendants' negligence, if any, and then, and only then, to address the issue of damages. In connection with damages, the jury would consider the issue of avoidable consequences.

A-4790-15T2

Plaintiff argues that the court's instruction did not clearly delineate the purpose for which the jury was permitted to consider evidence of J.B.K.'s post-treatment conduct. Accordingly, she contends that the jury's verdict should be reversed and the matter remanded for a new trial because the instructions could have led the jurors to believe that they could consider J.B.K.'s failure to follow up with his primary care physician or return to the hospital when deciding whether defendants were negligent. Plaintiff also argues that by giving the avoidable consequence charge, without expressly instructing the jury that post-treatment comparative negligence is not a defense to a medical malpractice claim, the defense was allowed to improperly conflate avoidable consequences and comparative negligence.

We reject these arguments as inconsistent with the record. The trial judge did not give a comparative negligence charge. Indeed, the trial judge agreed with plaintiff that comparative negligence was not applicable to this medical malpractice action. Read in full, the instructions did not suggest to the jury that it should consider J.B.K.'s post-treatment actions or inactions in deciding whether any of the defendants breached a duty of care to J.B.K. To the contrary, the instructions were clear that defendants' liability was to be considered first,

and damages and the related concept of avoidable consequences were only to be considered after the jury determined if any of the defendants were negligent.

In short, the jury instructions in this case were consistent with guidance from our Supreme Court and this court. See, e.g., Komlodi v. Picciano, 217 N.J. 387, 411-13 (2014); Ostrowski v. Azzara, 111 N.J. 429, 436-38 (1988); D'Aries v. Schell, 274 N.J. Super. 349, 360-61 (App. Div. 1994). Importantly, there was no evidence that the jury was confused or misled by the instructions or verdict sheet. See Cohen v. Cmty. Med. Ctr., 386 N.J. Super. 387, 399 (App. Div. 2006) (explaining that where appropriate instructions have been given, jurors are presumed to have followed them).

B.    Spoliation

Next, plaintiff argues that the trial court made several errors related to her claims of spoliation. First, she contends that it was an error to grant summary judgment ten days before trial. Second, she argues that the trial judge misconstrued the summary judgment ruling and unduly limited her attempts to elicit testimony about spoliation. Finally, she asserts that the trial court should have given a jury charge on an adverse inference from spoliation. None of these arguments are supported by the record.

A-4790-15T2

Spoliation involves "the hiding or destroying of litigation evidence," and may be remedied "to make whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; to punish the wrongdoer; and to deter others from such conduct." Rosenblit v. Zimmerman, 166 N.J. 391, 400-01 (2001). When a party can demonstrate spoliation, he or she may have several remedies including (1) a tort claim, (2) discovery sanctions, and (3) a spoliation inference. Id. at 401-03.

To establish a separate tort action, the plaintiff must prove the elements of a claim for fraudulent concealment of evidence. Id. at 406-07. Those elements include:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
>
> (2) That the evidence was material to the litigation;
>
> (3) That plaintiff could not reasonably have obtained access to the evidence from another source;
>
> (4) That defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation;
>
> (5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.
>
> [Ibid.]

14

A plaintiff may also seek a spoliation inference instruction if he or she can show that the defendant destroyed or concealed evidence during litigation.  Id. at 401.  The inference allows the jury "to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her."  Id. at 401-02.  To receive the benefit of a spoliation inference instruction, a party must demonstrate "prerequisites of intentionality" as to the alleged spoliator's conduct.  Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 258 (Law Div. 1993); see also Rosenblit, 166 N.J. at 411.

Here, plaintiff claimed that certain defendants altered or failed to produce some hospital records related to J.B.K.  In particular, plaintiff took issue with the striking out of three words on the handwritten discharge instructions related to J.B.K.'s September 29, 2010 treatment at the MMC emergency room.  Prior to trial, the court denied plaintiff's motion to sanction certain defendants.  The judge found that defendants had produced relevant computer-based information and had also offered to provide specific documents, if requested.  Plaintiff, however, never followed up on that offer.  Ultimately, the judge concluded that there was no evidence of spoliation and, therefore, denied the motion.

Thereafter, on December 24, 2015, certain defendants filed a motion for partial summary judgment to dismiss plaintiff's spoliation claim.  At the time

that motion was filed, the case was scheduled for trial on February 29, 2016. The court heard oral argument on the motion on February 19, 2016, and granted the motion in an order entered that same day. The court found that plaintiff never developed evidence supporting the spoliation claim and, therefore, there was no evidence to show that defendants intentionally destroyed, falsified, or concealed documents.

On this appeal, plaintiff does not challenge the court's substantive ruling granting summary judgment on the spoliation claim. Instead, she challenges the dismissal of the claim on procedural grounds. Specifically, she argues that defendants violated Rule 4:46-1 because they did not file their motion for summary judgment in a timely manner. We disagree.

Rule 4:46-1 provides that a motion for summary judgment "shall be returnable no later than 30 days before the scheduled trial date, unless the court otherwise orders for good cause shown[.]" The rule further provides that "if the decision is not communicated to the parties at least 10 days prior to the scheduled trial date, an application for adjournment shall be liberally granted." Ibid. That summary judgment rule does not establish time requirements "that must be met in every case for due process demands to be satisfied." Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 474 (App. Div. 2015). Instead,

the time requirements "provide a useful background for assessing whether [the party opposing the motion] had an opportunity to be heard at a meaningful time and in a meaningful manner." Ibid.

Here, the return date for defendants' motion was January 22, 2016, more than thirty days before the scheduled trial date of February 29, 2016. Although the court did not hear oral arguments until February 19, 2016, the court issued its order and stated the reasons for its decision on the record that same day, ten days before the trial date. The record establishes that plaintiff was given a meaningful opportunity to be heard on the motion. Accordingly, we discern no reversible error concerning the timing requirements set forth in Rule 4:46-1.

Next, plaintiff contends that the trial court misconstrued the scope of the summary judgment decision on her spoliation claim and improperly restricted her ability to bring out evidence at trial. We review such evidentiary issues for an abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Having reviewed the trial transcripts, we discern no abuse of discretion by the trial court. When the trial judge did limit plaintiff's examinations during trial, there was a foundation for each of those rulings. Just as importantly, the

record reflects that plaintiff was given the opportunity to question the doctors on the handwritten alteration on the discharge instructions. Thus, plaintiff suffered no prejudice since her counsel was afforded the opportunity to explore that alteration at trial.

Finally, we discern no error in the trial judge's decision not to give a spoliation inference instruction. To warrant such an instruction, plaintiff needed to present evidence that defendants intentionally destroyed or altered records. In pre-trial rulings and at trial, the court found that plaintiff had not presented such evidence. Accordingly, the trial court's decision not to give the instruction was proper.

In summary, having reviewed the extensive record in light of plaintiff's arguments, we discern no basis to reverse the jury verdict. The jury instructions, when considered in totality, were appropriate and correct and the rulings concerning spoliation were supported by the law and the material facts.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4790-15T2