**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1838-18

PAUL STRECKFUSS and
NANCY STRECKFUSS,
husband and wife,

      Plaintiffs-Appellants,

v.

SAGER DESAI, M.D.,
EDISON EMERGI MED,
"JOHN" LAKHLANI,
M.D. (first name fictitious),
"JOHN" MEHTA, M.D. (first
name fictitious) and RARITAN
BAY MEDICAL CENTER,

      Defendants,

and

KUMAR DASMAHAPATRA,
M.D.,

      Defendant-Respondent.

_____

Argued December 2, 2020 - Decided November 15, 2021

Before Judges Ostrer, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3612-14.

Craig M. Rothenberg argued the cause for appellants (Rothenberg, Rubenstein, Berliner & Shinrod, LLC, attorneys; Craig M. Rothenberg, of counsel and on the briefs; Susan V. Ferreira, on the briefs).

Sam Rosenberg argued the cause for respondent (Rosenberg Jacobs Heller & Fleming, PC, attorneys; Sam Rosenberg, of counsel and on the brief; Fred J. Hughes, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Plaintiffs Paul and Nancy Streckfuss appeal from the jury's no-cause verdict and the denial of their motion for a new trial in the medical negligence action they filed against defendant Kumar Dasmahapatra, M.D., the surgeon who performed Paul Streckfuss's inguinal hernia repair. They allege the following eight errors over the course of the nearly three-week trial:

> I. THE COURT ERRED IN ALLOWING THE TESTIMONY OF DEFENSE WITNESS, DR. MICHAEL CIENCEWICKI.
>
> II. THE COURT ERRED IN PERMITTING REFERENCES TO SCIP STANDARDS AND THE STANDARDS OF THE JOINT COMMISSION.
>
> III. THE COURT ERRED IN PERMITTING THE DEFENDANT TO ARGUE, AND IN INSTRUCTING THE JURY, THAT THE JURY COULD CONSIDER

A-1838-18

WHETHER THE DEFENDANT'S MANAGEMENT OF PLAINTIFF'S CARE WAS WITHIN HIS "MEDICAL JUDGMENT."

A. DEFENDANT'S "JUDGMENT" TO WITHHOLD PHARMACEUTICAL ANTICOAGULANTS WAS NOT PREMISED UPON DR. BONANNI'S FOUNDATIONAL CRITERION: RISK OF BLEEDING.

B. DEFENDANT'S "JUDGMENT" TO WITHHOLD PHARMACEUTICAL ANTICOAGULANTS WAS NOT PREMISED UPON DR. BONANNI'S FOUNDATIONAL CRITERION: "WHAT THE PATIENT WANTS."

C. DEFENDANT'S "JUDGMENT" TO WITHHOLD PHARMACEUTICAL ANTICOAGULANTS WAS NOT PREMISED UPON DR. BONANNI'S FOUNDATIONAL CRITERION: CONSIDERATION OF THE PATIENT'S RISKS.

D. DEFENDANT'S "JUDGMENT" TO WITHHOLD ANTICOAGULANTS WAS BASED UPON ONLY ONE OF DR. BONANNI'S FOUR FOUNDATIONAL CRITERIA: THE TYPE OF SURGERY.

E. DR. BONANNI CONCEDED THAT THE DEFENDANT'S DECISION WAS NOT HIS "MEDICAL JUDGMENT" AS CONTEMPLATED BY LAW.

IV. THE MEDICAL JUDGMENT CHARGE WAS NOT TAILORED TO THE EVIDENCE IN THE CASE.

3

V. PLAINTIFFS WERE PREJUDICED BY THE DEFENSE OPENING STATEMENT, TESTIMONY, AND CLOSING ARGUMENTS CONCERNING THE ABSENCE FROM THE TRIAL OF DR. DESAI, PLAINTIFF'S PRIMARY CARE PHYSICIAN.

    A. DEFENSE COUNSEL IMPROPERLY INVITED THE JURY TO SPECULATE.

    B. DEFENSE COUNSEL MADE AN IMPROPER MISSING WITNESS INSINUATION.

    C. DEFENSE COUNSEL MISSTATED PLAINTIFFS' BURDEN OF PROOF.

    D. THE COURT'S CURATIVE INSTRUCTION WAS INSUFFICIENT TO OVERCOME THE PREJUDICE.

VI. THE DEFENDANT'S WITNESS AND COUNSEL MADE IMPROPER REFERENCES TO THREE OTHER "SURGERIES" FOR WHICH THE PLAINTIFF WAS "CLEARED."

VII. THE DEFENSE CLOSING ARGUMENT COMPOUNDED THE PREJUDICE BY IMPROPER CHARACTERIZATION OF WITNESSES AND TESTIMONY.

VIII. THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND THE RESULT OF CUMULATIVE ERROR.

Having reviewed the trial record, we conclude the case was fairly tried and find no error that would warrant overturning the jury's verdict. Accordingly, we affirm.

A-1838-18

The case was tried before Judge McCloskey. The evidence the jury heard was extensive and often very technical. We summarize the salient points. After plaintiff Paul Streckfuss complained to his primary care doctor, Sager Desai, M.D., about pain and swelling in his groin in 2012, Dr. Desai suggested he immediately see a surgeon, recommending defendant Dasmahapatra as well as two others. Dr. Desai was aware when he recommended plaintiff see a surgeon of plaintiff's history of health problems.

Specifically, in December 2009, plaintiff suffered superficial phlebitis of his right leg, resulting in prescription of an anticoagulant, Coumadin. Plaintiff took Coumadin for about six months, except for brief periods relating to two eye surgeries for which he was medically cleared. Plaintiff stopped taking Coumadin after he experienced life-threatening, gastrointestinal bleeding in late May 2010, necessitating a stay in the ICU where he received nine units of blood and four units of fresh frozen plasma to replace necessary clotting factors. Plaintiff's hospital records note gastroenterologists attributed the bleeding to diverticulosis. In June 2010, plaintiff suffered a recurrence of phlebitis. The following month, Dr. Desai cleared him for insertion of an IVC filter, which plaintiffs' expert explained was inserted via a peripheral vein into the inferior

5

vena cava and "set like an umbrella," in order to prevent blood clots from migrating from the leg to the lungs.

When plaintiff went to see defendant two years later in May 2012, defendant's nurse took a medical history during which plaintiff informed her of the placement of the IVC filter, the blood clots in his right leg, and the near-fatal intestinal bleeding incident he experienced while on Coumadin. Defendant reviewed that history with plaintiff, testifying he specifically recalled asking plaintiff why he wasn't taking a blood-thinner, because defendant thought it "unusual" for someone with an IVC filter not to be taking anticoagulant medication. Defendant claimed plaintiff seemed "very anxious" about anticoagulants given his history and would not "even think about" going on anticoagulation. Plaintiff denied ever talking with defendant about it.

Defendant's office sent plaintiff a "surgery appointment letter," a pre-printed form advising plaintiff through a series of checkboxes, blanks and some handwritten information when and where he was scheduled for surgery to repair a right inguinal hernia and of the pre-admission testing that would be required. Defendant's office staff checked "yes" next to the statement "Medical Clearance is required from Primary Care Physician or Cardiologist before surgery." Plaintiff testified he had the pre-admission testing done, bloodwork and an EKG,

A-1838-18

but did not visit Dr. Desai, or advise him the surgery had been scheduled, and that no one from defendant's office ever discussed the medical clearance issue with him.

Defendant testified that "medical clearance" meant assessing the patient for any potential cardiac or respiratory contraindications for surgery, and there was no requirement that he obtain medical clearance from any other physician before operating on plaintiff. He testified he routinely determined a patient's suitability for surgery by relying on the medical history supplied by the patient and the pre-operative test results, as he did with plaintiff. Defendant explained he would only seek additional records or consult with a patient's primary doctor if the patient was unclear as to why he had been referred, or was unable to provide a full history, or if defendant had concerns about the patient's fitness for surgery. Defendant, who estimated he had performed 5,000 to 6,000 inguinal hernia repair surgeries over the course of his career, testified he did not seek out any additional records or consult with Dr. Desai about plaintiff because defendant believed he had "all the relevant information that [he] needed to . . . make a clinical decision as to what [was] best for [his] patient."

Defendant performed plaintiff's hernia repair surgery in June 2012. In the hospital record, defendant noted plaintiff's past medical history was

"[s]ignificant for a DVT [deep vein thrombosis] in the right leg in 2011 for which he required placement of an IVC filter." In order to prevent DVT, according to the experts who testified at trial, this inguinal hernia repair surgery can be performed using mechanical prophylaxis, i.e., compression stockings, or pharmacologic prophylaxis, i.e., anticoagulation medication, or a combination of the two.

Defendant testified he considers the risks and benefits of using anticoagulation medication to prevent DVT going into any surgery. But because the risk of developing DVT is very low in inguinal hernia repairs, but bleeding complications are common, he always uses mechanical prophylaxis. Defendant performed plaintiff's surgery using compression stockings, i.e., mechanical prophylaxis. Plaintiff was discharged from the hospital the same day of his surgery and instructed to walk and keep his legs elevated, which he did.

Plaintiff nevertheless suffered a rare, extreme clotting situation a few days after the surgery, with multiple blood clots occurring above and below the IVC filter. Unable to mechanically remove the clots, doctors used a tissue plasminogen activator (tPA) to dissolve them. Use of the tPA resulted in plaintiff suffering extensive bleeding, leading to a three-month hospital/rehabilitation facility stay and his loss of a testicle. The blood clots

also caused phlebitis and post-phlebitic syndrome, causing plaintiff to suffer swelling, discoloration and ulceration of his legs, limiting his ability to engage in daily life activities. Finally, plaintiff also suffered erectile dysfunction, although the experts disagreed as to whether it was the result of complications from the surgery, and whether plaintiff should avoid the use of Cialis to remedy the problem. In July 2012, plaintiff resumed the use of Coumadin and has since that time not suffered any significant bleeding.

The main disputes at trial were over whether the standard of care included defendant obtaining medical clearance from Dr. Desai before surgical repair of plaintiff's inguinal hernia and whether failure to obtain that clearance was a proximate cause of plaintiff's injuries — although neither of those issues were ultimately included on the verdict sheet; whether defendant breached the standard of care by failing to employ anticoagulant medicines as a pharmacologic prophylaxis in addition to his use of mechanical prophylaxis during plaintiff's surgery; and whether defendant was entitled to a medical judgment charge in his choice of prophylaxis.

Underlying all those disputes was a disagreement over the risks this out-patient inguinal hernia repair, which the experts agreed is properly characterized as minor surgery, posed to plaintiff. The experts all agreed the formation of

blood clots and bleeding are risks associated with any surgery. They also agreed that surgeons employ different methods for reducing the risk of blood clots through use of mechanical interventions, such as compression stockings, and pharmacologic interventions, meaning anticoagulants, such as Heparin or Lovenox. The experts agreed that use of either method reduces a patient's risk of clots, although neither will eliminate it entirely. They also agreed that use of anticoagulants carries the potential risk of bleeding.

Plaintiff's experts relied on a study pegging the risk of developing DVT in major surgeries, which all concede this surgery was not, at 1.9 percent with Lovenox and 3.4 percent with only mechanical prophylaxis. The same study puts the risk of bleeding on Lovenox at 4.5 percent, and the risk of bleeding using only mechanical prophylaxis at 2.3 percent. A surgeon's decision to use one or the other prophylaxis, or both, will depend on the surgeon's assessment of the risks and benefits of each method based on patient- and procedure-specific risk factors.

Plaintiffs' experts, a general surgeon, Dr. Michael Drew, and an internist and hematologist, Dr. Lionel Grossbard, relied on the Caprini risk assessment model for quantifying a surgical patient's risk for venous thromboembolism, including both pulmonary embolism and deep vein thrombosis. The Caprini

10

model assigns points to various risk factors, which when summed, places the patient in a risk category with recommended prophylaxis. Dr. Drew conceded, however, the Caprini model was not the only risk assessment model available, and that the standard of care required only that a surgeon assess the patient's risks and employ an appropriate intervention.

Dr. Drew testified plaintiff had several risk factors for developing DVT, including his age, his weight, his varicose veins, implantation of an IVC filter, and that he was undergoing surgery, putting him at high risk for developing DVT under the Caprini model. He acknowledged on cross-examination, however, that plaintiff had had a prior hypercoagulability workup that was negative for clotting problems, which defendant was aware of before performing plaintiff's surgery. Dr. Drew acknowledged there was never a time — either before or after the surgery — when plaintiff was determined to be at other than a normal risk of blood clots. In Dr. Drew's opinion, plaintiff had an approximately six percent chance of developing DVT post-procedure without any prophylaxis, notwithstanding that same-day inguinal hernia surgery generally has a very low frequency for the development of DVT.

For patients at high risk of developing DVT, who are not at high risk of bleeding, the Caprini model recommends surgeons employ a combination of

11

pharmacologic and mechanical prophylaxis. But for patients at high risk of developing DVT, who are also at high risk of major bleeding complications or for whom the consequences of bleeding may be particularly severe, the model recommends mechanical prophylaxis until the risk of bleeding diminishes and pharmacologic prophylaxis may be initiated. Dr. Drew testified that in addition to assessing plaintiff's risk for developing DVT, it was "extremely important" for defendant to have taken into consideration plaintiff's near-fatal bleed in determining an appropriate prophylaxis.

Both Dr. Drew and plaintiffs' hematology expert, Dr. Grossbard, testified that plaintiff was not at high risk of bleeding complications, despite his near-fatal gastrointestinal bleed two years earlier, and there were no contraindications for the use of anticoagulants during his inguinal hernia surgery. Having reviewed plaintiff's medical records, both were of the opinion that plaintiff's 2010 bleeding incident was caused by an overdose of Coumadin and did not reflect an underlying risk of bleeding. They based their opinions on a review of plaintiff's Coumadin prescription over several months and an INR[1] reading of

---

[1] The INR (international normalized ratio) is a laboratory measurement of "the risk of bleeding or the coagulation status of the patient." See https://www.ncbi.nlm.nih.gov/books/NBK507707/ (last visited October 22, 2021).

4.7 in plaintiff's hospital records at the time of his gastrointestinal bleed. A normal INR reading is less than 1.1; a therapeutic INR for a person on Coumadin to prevent blood clots, would be about 2.5.

On cross-examination, Dr. Drew conceded that the gastroenterologists who examined plaintiff at that time concluded his bleed was likely due to diverticulosis, and clarified his own opinion was that plaintiff bled from diverticulosis as a result of an overdose of Coumadin. He further admitted diverticulosis is a chronic condition that can re-bleed even when the patient is not on an anticoagulant, and that plaintiff's physicians did not prescribe an anticoagulant after plaintiff's bleed because they were concerned about his risk of bleeding. Dr. Drew also conceded on cross-examination that chemical prophylaxis for patients at high risk of developing DVT is only "automatically required" "if the patient has no significant indication that he'll bleed."

Dr. Drew testified defendant breached his duty of care by not using an anticoagulant drug, in addition to compression stockings, during plaintiff's surgery to prevent clotting. He also testified defendant deviated by "not . . . obtain[ing] the medical clearance" and not "try[ing to] speak with any of [plaintiff's] treating physicians" about plaintiff's "ten unit bleed, [and] being on Coumadin," because that would have allowed defendant to accurately assess the

risks the surgery posed to plaintiff. Dr. Drew admitted, however, that plaintiff was an appropriate candidate for the surgery, and that he did not know what Dr. Desai would have said or recommended had he seen plaintiff for clearance before the surgery. He maintained, nevertheless, that Dr. Desai possessed relevant information and there was no indication he would have refused to share it with defendant.

Dr. Drew testified plaintiff suffered blood clots because defendant breached the standard of care by failing to use anticoagulant drugs in addition to the compression stockings during plaintiff's surgery. In his "opinion to a reasonable degree of medical certainty" "had [plaintiff] received the chemical prophylaxis" his clotting problems could have been avoided. Dr. Grossbard opined it was more likely than not that plaintiff would not have suffered the massive blood clots he did had he received anticoagulants during surgery, and thus would not have suffered the injuries consequent to the clots and their treatment.

Defendant's general surgery expert, Dr. Fernando Bonanni, testified the Caprini model is only a guideline for surgeons to consider in light of a patient's circumstances, and it did not represent the standard of care. He noted the professional article about the Caprini model, on which plaintiffs' experts relied,

14

focused on major surgeries, whereas inguinal hernia repair surgery is a minor procedure in which patients are immobilized for only a brief period and are ambulatory shortly afterwards, thereby reducing their risks of developing blood clots. He estimated that probably fifty percent of surgeons use only mechanical prophylaxis in performing the surgery.

Although Dr. Bonanni agreed plaintiff would be considered at high risk for clots under the Caprini model, the doctor also believed plaintiff presented a bleeding risk based on his near-fatal gastrointestinal bleed, resulting in implantation of the IVC filter and plaintiff's noted wariness of anticoagulant medicines. He testified that employing an anticoagulant in plaintiff's case could have resulted in another life-threatening bleed.

Dr. Bonanni testified that because plaintiff presented risks for both blood clots and bleeding, defendant needed to weigh those risks and make a judgment call as to the appropriate prophylaxis for plaintiff. In Dr. Bonanni's opinion, defendant made the right call in not using an anticoagulant, particularly because the surgery was a minor, same-day procedure, and plaintiff's IVC filter reduced the risk that any clot would travel to his heart. Dr. Bonanni noted defendant's treatment of plaintiff was consistent with the Caprini model's recommendations for patients who are at risk for both blood clots and bleeding.

15

A-1838-18

Dr. Bonanni rejected plaintiffs' experts' contention that plaintiff's elevated INR in the hospital record at the time of his near-fatal gastrointestinal bleed reflected a supertherapeutic dose of Coumadin and that his risk of bleeding was otherwise normal. In Dr. Bonanni's view, that INR was unreliable because plaintiff had "bled out all his coagulation factors." Dr. Bonanni testified he didn't think doctors "can really tell exactly what was going on with his Coumadin or his INR because all your testing is not valuable in a patient who's bled nine units of blood," or more than two-thirds of all the blood in his body. In those circumstances, "you can't really depend on that INR to tell you anything about the Coumadin that was given to the patient."[2] He also testified there was nothing in plaintiff's medical records evidencing an overdose of Coumadin.

Dr. Bonanni believed plaintiff's gastrointestinal bleed happened because "he was on a blood thinner, and he had diverticulosis." He testified that diverticulosis can re-bleed, and a patient is more susceptible to bleeding while on an anticoagulant. Dr. Bonanni noted that after plaintiff's near-fatal bleed, his

---

[2] Defendant likewise testified that knowing what plaintiff's INR had been would not have impelled him to add an anticoagulant for plaintiff's surgery. Defendant testified, "It didn't matter to me whether the INR was high or low. He bled," likely because of his diverticulosis. Defendant testified, "Patients with diverticulosis will bleed and [when] they're on Coumadin are almost uncontrollable."

A-1838-18

doctors took him off Coumadin out of concern for another bleed and implanted an IVC filter to protect him from a blood clot traveling to his heart.

Dr. Bonanni also disagreed with Dr. Drew that defendant was negligent in not obtaining medical clearance from another doctor before taking plaintiff into surgery. In Dr. Bonanni's opinion, Dr. Desai would not have recommended that plaintiff immediately see a surgeon to repair an inguinal hernia unless he believed plaintiff was an appropriate candidate for the procedure. Dr. Bonanni also testified the form completed by defendant's staff, checking the box indicating the need for medical clearance, did not have anything to do with the standard of care. Dr. Bonanni opined defendant could assess plaintiff's risks and determine his fitness for surgery based upon defendant's knowledge of plaintiff's medical history and his pre-admission testing. As to causation, Dr. Bonanni testified it was impossible to know, within a reasonable degree of medical certainty, whether plaintiff would have developed DVT if Lovenox had been administered.

On the issue of medical clearance, defendant also presented a fact witness, Dr. Michael Ciencewicki, the chief medical officer at Raritan Bay Medical Center where plaintiff's hernia repair surgery was performed, who testified the hospital did not require a patient be cleared for surgery by anyone other than the

surgeon. Dr. Ciencewicki testified defendant did not violate the hospital's policies by clearing plaintiff for surgery himself. On cross-examination, plaintiffs' counsel got the witness to confirm that all he was "saying was [defendant] was in compliance [with the hospital's rules], not whether what he did was or was not negligent."

Plaintiffs objected to Dr. Ciencewicki's testimony before he testified, arguing the proffered testimony was not probative of anything and would be tantamount to standard of care testimony from someone not qualified to give it. Judge McCloskey disagreed, ruling plaintiffs "squarely placed" the issue of medical clearance in the case, and there had already been "a lot of [differing] testimony" about what medical clearance means. The judge found the proffered testimony "clarifies . . . the concept of medical clearance" from the perspective of the hospital where the surgery was performed and was, thus, probative and helpful to the trier of fact. After the jury's verdict, plaintiffs argued the court's "error" in admitting Dr. Ciencewicki's testimony warranted a new trial. Judge McCloskey again disagreed, repeating his earlier point that plaintiffs "placed the issue of medical clearance into issue in this case," and that defendant had "a right to defend against what medical clearance was or wasn't," as a fact issue. The judge found the testimony was relevant to an issue in dispute, the meaning

of medical clearance, and was neither prejudicial nor confusing to the jury. He found the witness was plainly not proffered as an expert, but as a fact witness providing factual support for Dr. Bonanni's opinion on standard of care.

We begin our analysis by addressing plaintiffs' claims that the court erred in permitting Dr. Ciencewicki's testimony. As is well-established, we review evidentiary rulings only for abuse of discretion. Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019). A trial judge's decision to admit or exclude evidence is entitled to deference absent "a clear error of judgment." Ibid. (quoting Griffin v. City of East Orange, 225 N.J. 400, 413 (2016)). Thus, a reviewing court "will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Id. at 551-52 (quoting Griffin, 225 N.J. at 413). We review decisions on new trial motions using the same standard as the trial court, meaning we will not overturn the jury's verdict unless clearly convinced there was a miscarriage of justice. Hayes v. Delamotte, 231 N.J. 373, 386 (2018).

Applying those standards here, we find no error in the admission of Dr. Ciencewicki's testimony or his fleeting references to the Joint Accreditation and Commission of Hospitals (JACOH) and the Surgical Care Improvement Program (SCIP) standards, which plaintiffs maintain "absolved" defendant from obtaining medical clearance and "conjured a 'super expert' to relieve [him] from

19

A-1838-18

compliance with the standard of care." As already noted, Dr. Drew asserted on behalf of plaintiffs that defendant violated the standard of care by not obtaining medical clearance from Dr. Desai or another of plaintiff's treating physicians before performing plaintiff's surgery. Dr. Bonanni opined defendant didn't require medical clearance from anyone before clearing plaintiff for the surgery. In addition to not agreeing on who had to medically clear the patient for surgery, the parties disputed the meaning of the phrase "medical clearance" itself: plaintiffs argued it meant defendant would communicate with plaintiff's treating physicians about plaintiff's present and past medical issues, whereas defendant maintained it related only to defendant's determination as to whether plaintiff was an appropriate candidate for surgery, particularly with respect to any cardiac or pulmonary issues.

Those disputes were a constant throughout this trial, and the parties continue to argue them in their appellate briefs. Plaintiffs assert Dr. Ciencewicki's testimony permitted defendant to assert that although he told plaintiff in the surgery appointment letter that medical clearance from his primary physician or cardiologist was required before surgery, defendant went ahead with the surgery when plaintiff "showed up" without it "because he was empowered by the hospital to 'clear' [plaintiff] himself — using the term in a

way completely inconsistent" with how he'd used the term in his letter to plaintiff and "in an entirely different way than it was meant by plaintiffs' experts."

Plaintiffs' argument only underscores for us that Dr. Ciencewicki's testimony about the meaning of the phrase medical clearance from the perspective of the hospital where defendant practiced and performed the surgery was relevant to an obviously contested issue and therefore admissible. See N.J.R.E. 401-402; State v. Williams, 240 N.J. 225, 235 (2019); Verdicchio v. Ricca, 179 N.J. 1, 33-34 (2004). We agree with Judge McCloskey the testimony presented no risk of confusing the jury, N.J.R.E. 403, because Dr. Ciencewicki's testimony was unambiguously that of a fact witness and not an expert. The doctor's testimony was relatively brief, and he did not provide any testimony as to the standard of care, nor did he offer an opinion as to whether defendant was negligent in his treatment of plaintiff — points plaintiffs' counsel made repeatedly to the jury.

Dr. Ciencewicki's testimony about what the hospital meant by the term medical clearance provided factual support for defendant's and his expert's understanding of the term and was thus entirely proper. Because defendant was not relying on the hospital's policy on medical clearance for surgery to establish

the standard of care for defendant, the testimony did not run afoul of our holding in Johnson v. Mountainside Hosp., 239 N.J. Super. 312, 323-24 (App. Div. 1990), that a party may not use hospital protocols to establish the standard of care for physicians.

Dr. Ciencewicki's testimony as to the JACOH and the SCIP standards consisted of him testifying that "[t]he Joint Commission does a triannual survey and [it] will select certain policies to review to make sure that they're in conformance with [its] standards," and that he recalled it had reviewed the hospital's policies relating to surgery as of June 2012. No one testified to what these standards were, and defense counsel did not refer to either the JACOH or the SCIP standards in his closing argument to the jury. Accordingly, even if Dr. Ciencewicki's testimony as to the JACOH or the SCIP standards was arguably improperly admitted, because irrelevant, the reference was so fleeting we could not find it capable of any prejudice to plaintiffs, much less of producing an unjust result. Thus, we find no error in the court's denial of plaintiffs' new trial motion on that basis.

We also reject plaintiffs' claims that the trial court erred in giving a medical judgment charge regarding defendant's decision to perform plaintiff's surgery using only mechanical prophylaxis. Plaintiffs argue, as they did in the

trial court, that the charge was inappropriate based on defendant's testimony that he never employed prophylactic anticoagulation in performing surgery to repair an inguinal hernia. Plaintiffs contended defendant did not exercise any medical judgment in performing plaintiff's surgery using mechanical prophylaxis, but "simply did what he always does without consideration to any facts and circumstances attended to this specific patient."

Defendant argued to the trial court, and repeats on appeal, that "[t]he medical judgment charge doesn't necessarily implicate judgment that is made at the exact time of the treatment," but is instead dependent on there being two acceptable options under the standard of care. Defense counsel contended that so long as there are two schools of thought, defendant could have "years before addressed the issue," and decided not to use chemical prophylaxis with "same day surgery hernia patients," noting Dr. Bonanni's testimony that fifty percent of surgeons performing the surgery use anticoagulants and fifty percent don't and that either is acceptable practice.

Judge McCloskey agreed with defendant based on the testimony that there was "squarely an issue as to whether . . . [defendant] believed it was safer to administer and utilize mechanical prophylaxis to the patient during the surgery

as opposed to utilizing chemical prophylaxis because of a concern of his bleeding history and his propensity to develop DVTs. That's a judgment."

We agree. A medical judgment charge is appropriate where the trial evidence reflects that a physician may choose between two generally accepted courses of treatment. Das v. Thani, 171 N.J. 518, 527 (2002). Care must be taken in such cases to ensure the evidence supports the course of treatment as a choice between two or more equally acceptable and medically reasonable approaches, lest the jury be misled into excusing a defendant's deviation from the standard of care as medical judgment. Velazquez v. Portadin, 163 N.J. 677, 688-90 (2000).

Here, the parties' general surgery experts both testified inguinal hernia repair surgery was a minor procedure, generally presenting a very low frequency for the development of DVT. They also agreed there were risks and benefits associated with the use of both pharmacologic and mechanical prophylaxis. The experts disagreed about which was appropriate for plaintiff's surgery based on his medical history, specifically whether he was at elevated risk of bleeding as well as for DVT.

There is no question but that defendant gave conflicting testimony on when and how he determined what prophylaxis to use during same-day inguinal

A-1838-18

hernia repair — testifying both that he decided to use only mechanical prophylaxis for plaintiff in May 2012, shortly before his surgery, and that over the course of 5,000 to 6,000 inguinal hernia repairs he had never used pharmacologic prophylaxis for a same-day inguinal hernia surgery. A fair reading of defendant's testimony as a whole, however, suggests he made a conscious decision, based on his understanding of the low incidence of DVT in same-day inguinal hernia surgery and the higher risk of bleeding the procedure posed, that mechanical prophylaxis was sufficient for such surgeries as a general rule. And, presented with plaintiff's medical history and risk factors, defendant found no basis to alter that judgment with respect to plaintiff's June 2012 surgery. Thus, defendant's judgment was to proceed with plaintiff's surgery using his normal procedures, that is, using only mechanical prophylaxis.

Critically, the experts agreed the standard of care required a surgeon to employ some type of prophylaxis during this surgery based on his or her assessment of the risk of the procedure and any specific risks presented by the patient. They also agreed the use of mechanical prophylaxis was not inappropriate. What they disagreed about was whether mechanical prophylaxis was sufficient given plaintiff's high risk of clots and whether adding an anticoagulant was warranted given plaintiff's history of diverticulosis and

25

A-1838-18

bleeding, the low incidence of DVT reported for this same-day procedure and the hypercoagulability blood workup revealing plaintiff's risk of clots was normal.

Relying on the Caprini risk assessment model, Dr. Drew testified defendant deviated from the standard of care by his failure to add an anticoagulant prophylaxis to the mechanical prophylaxis he employed, notwithstanding plaintiff's prior near-fatal bleed while on an anticoagulant, because, in the doctor's view, that bleed was caused by an overdose of Coumadin in combination with his diverticulosis. Because Dr. Drew contended plaintiff was not at high risk of bleeding, he contended the standard of care, again relying on the Caprini model, mandated a combination of mechanical and pharmacological prophylaxis. Dr. Bonanni, on the other hand, opined that adding the anticoagulant was a judgment call and, in his opinion, not worth the risk given plaintiff's history of near-fatal bleed while taking an anticoagulant and the low frequency of DVTs following same-day inguinal hernia repair.

Our courts have long recognized that "the distinction between the 'exercise of judgment' and a deviation from accepted practice" can be complicated. Velazquez, 163 N.J. at 686. In our view, the court was correct to give the medical judgment charge on this record for two reasons. First, plaintiffs' general

surgery expert testified the Caprini model did not represent the standard of care, and that the standard required only that a surgeon assess the patient's risk and use an appropriate intervention. The scholarly article on which plaintiffs' experts relied discussing the Caprini model underscored that point as it was couched in recommendations and suggestions, suggesting the ultimate choice of prophylaxis to combat DVT, even in the model relied on by plaintiffs' expert, depended on the surgeon's judgment assessing both procedure- and patient-specific risks.

Second, although a lot of the focus of the expert testimony was on the factual issue of whether plaintiff's gastrointestinal bleed was caused by an overdose of Coumadin, the standard of care did not rest on it. See Velazquez, 163 N.J. at 689 (explaining when standard of care required monitoring patient while on labor-inducing drug, the jury had to decide whether the defendants monitored the patient without reference to the medical judgment charge). Stated differently, the experts did not agree that if plaintiff's gastrointestinal bleed had been caused by an overdose of Coumadin, the standard of care would require both pharmacological and mechanical prophylaxis during the surgery.

Plaintiffs' experts testified plaintiff was not at risk of bleeding during the surgery because he had only bled when overdosed on Coumadin. Defendant's

27

expert testified plaintiff's diverticulosis and the severity of the bleed when he was last on Coumadin put plaintiff at risk of bleeding again during the surgery. Thus, the experts did not simply disagree over why plaintiff experienced his near-fatal gastrointestinal bleed, they also disagreed over whether the bleed, regardless of cause, affected plaintiff's risk of bleeding during this surgery, and thus whether pharmacological prophylaxis was warranted. Because the expert testimony represented two schools of thought as to whether to employ an anticoagulant drug in addition to mechanical prophylaxis for plaintiff's inguinal hernia repair in light of his previous near-fatal bleed, the medical judgment charge was appropriate. See Schueler v. Strelinger, 43 N.J. 330, 346 (1964) (holding "when a surgeon selects one of two courses, . . . either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued").

We also reject plaintiffs' arguments that Dr. Bonanni's testimony about the factors a surgeon should consider in making a judgment as to which prophylaxis to employ in a given surgery, a number of which plaintiffs contend defendant did not consider, undermined the expert's opinion that the choice of prophylaxis in plaintiff's case was a judgment call, and that the judgment charge was not tailored to the facts in the case. As already discussed, the judgment

charge is given when the physician has a choice among medically acceptable courses of action, Velazquez, 163 N.J. at 687; here, whether to employ pharmacologic prophylaxis. Plaintiffs' arguments that defendant did not exercise any judgment, and that his choice did not comport with the standard of care are addressed in the model charge itself. See Model Jury Charge (Civil), 5.50G, "Medical Judgment" (June 2014) ("your focus should be on whether accepted standards of medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives and, if so, whether what the doctor actually did to diagnose or treat this patient was accepted as standard medical practice").

Plaintiffs' argument that the judgment charge was not properly tailored to their theory of liability because it did not "identify for the jury what the two schools of thought were and how they were involved with the facts of this case" is without merit. Judge McCloskey charged the jury that:

> A doctor may have to exercise judgment when diagnosing and treating a patient. However, alternative diagnosis or treatment choices must be in accordance with accepted standards of medical practice. Therefore, your focus should be on whether accepted standards of medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives, and, if so, whether what the doctor actually did to diagnose or treat this patient was accepted as standard medical practice.

A-1838-18

If you determine that the accepted standards of medical practice with respect to whether to administer pharmacologic versus mechanical prophylaxis to the plaintiff, Paul Streckfuss, in connection with this inguinal hernia surgery, did not allow for the treatment alternatives the defendant doctor made here, then the doctor would be negligent.

If, on the other hand, you determine that the accepted standards of medical practice for treatment or diagnosis with respect to whether to administer pharmacologic versus mechanical prophylaxis to the plaintiff, Paul Streckfuss, in connection with his inguinal hernia surgery, did allow for the treatment alternative the defendant doctor made here, then the doctor would not be negligent.

If you find that the defendant has complied with the accepted standard of care, then he is not liable to the plaintiffs regardless of the result.

On the other hand, if you find that the defendant has deviated from the standard of care resulting in injury or damage to plaintiff, then you should find defendant negligent, and return a verdict for plaintiff.

The charge closely tracked the language of the model charge and focused the jury on the only judgment issue in the case: whether "the accepted standards of medical practice with respect to whether to administer pharmacologic versus mechanical prophylaxis to the plaintiff . . . in connection with this inguinal hernia surgery, did allow for the treatment alternative the defendant doctor made here." Because the charge "separate[d] out [that] aspect[] of the medical care

30

that involved judgment," <u>Saks v. Ng</u>, 383 N.J. Super. 76, 96 (App. Div. 2006) (quoting <u>Velazquez</u>, 163 N.J. at 688), nothing more was required.

We turn back to the issue of medical clearance to discuss plaintiffs' claims that they were prejudiced by defendant's opening statement, closing argument and certain testimony regarding Dr. Desai's absence at trial. As we have already related, the parties vigorously contested the meaning of medical clearance and whether the standard of care required defendant to obtain medical clearance from another of plaintiff's physicians, particularly Dr. Desai, before taking plaintiff into surgery, notwithstanding that the case went to the jury only on the issue of whether defendant was negligent by failing to use an anticoagulant during the surgery.

In his opening statement, plaintiffs' counsel stated Dr. Grossbard would testify that had he been asked to medically clear plaintiff for surgery, "he would have said Caprini risk, high risk, got to anticoagulate[] him," and "if you're not comfortable, don't do the surgery." Defense counsel objected, arguing Dr. Grossbard, plaintiffs' internal medicine and hematology expert, could not give that testimony because it amounted to offering a standard of care opinion he was not qualified to give about the care provided by defendant, a general surgeon. <u>See</u> <u>Nicholas v. Mynster</u>, 213 N.J. 463, 468 (2013) (barring the plaintiffs' expert,

who did not practice in the same medical specialties as the defendant doctors, from testifying to the standard of care governing the defendants).

In the course of that colloquy, defense counsel argued to the court that Dr. Grossbard should not testify on the subject of medical clearance because there was no testimony that defendant should have consulted a hematologist and "zero evidence that even if this clearance was followed up on, that Dr. Desai would not have cleared him," meaning that plaintiffs could not establish proximate cause on their medical clearance claim. For his part, plaintiffs' counsel objected to defense counsel arguing to the jury about the absence of evidence as to whether Dr. Desai would have cleared plaintiff for surgery. He argued it was impossible to know what Dr. Desai would have done because he wasn't asked for clearance. Judge McCloskey sustained the objection and gave a brief curative instruction before defendant's opening that plaintiffs were proffering only one liability expert — and that expert was Dr. Drew, not Dr. Grossbard.

Defense counsel in his opening statement explained what medical clearance meant from defendant's and the hospital's perspective, that plaintiff was an appropriate candidate for surgery, and said it was unclear why plaintiff never went back to Dr. Desai after being advised by defendant's office to do so. Counsel then asserted "there is absolutely no evidence — and I'll emphasize that

again — no evidence in this case that will demonstrate that Dr. Desai would not have cleared [plaintiff] for surgery had he returned. In fact, he had cleared him for prior surgical procedures that [plaintiff] underwent." Counsel went on to explain "the reason that's important" is because even if they found defendant "deviated as far as the medical clearance issue, there is no established cause connection between that and any injury because there's no evidence in this case that clearance would have been withheld." Although plaintiffs' counsel objected to those comments, he stated several times he did not want a curative instruction given at that time.

The issue came up twice more during witness testimony. When plaintiffs' counsel attempted to cross-examine Dr. Bonanni on the issue of medical clearance with reference to Dr. Desai's deposition testimony, defense counsel objected, arguing the deposition testimony was inadmissible hearsay unless plaintiffs intended to call Dr. Desai. Judge McCloskey sustained the objection, barring plaintiffs' counsel from reading from Dr. Desai's deposition in his examination of Dr. Bonanni.

The issue came up again in defense counsel's cross-examination of Dr. Drew[3] when plaintiffs' counsel objected to defense counsel asking "[y]ou don't

---

[3] These witnesses were taken out of turn to accommodate the doctors' schedules.

have any opinion as to whether Dr. Desai would or would not have recommended prophylaxis for this patient, even had he seen the patient before surgery." Defense counsel claimed the question was proper because Dr. Drew was asked at deposition whether he had an opinion as to whether Dr. Desai would have recommended perioperative anticoagulation had he been asked to clear plaintiff for the surgery, and responded that he did not know whether Dr. Desai would or would not have done so.

Defense counsel argued the question pointed to a lack of evidence, that is, plaintiffs' inability to prove proximate cause in connection with their claimed medical clearance deviation. Judge McCloskey noted that neither side had chosen to call Dr. Desai, with the experts relying on what they reviewed in the record. The judge made clear he would not permit either side to speculate as to what Dr. Desai "would have done or should have done in the absence of him testifying" at trial. The judge, however, overruled the objection, noting one of plaintiffs' claims of deviation was defendant's failure to obtain medical clearance from Dr. Desai, and the question, which had been asked and answered without objection at Dr. Drew's deposition, went to the credibility of the doctor's opinion.

A-1838-18

Before defense counsel made his closing argument, he made inquiry of the court as to what he was permitted to argue on the issue of medical clearance. In accordance with the court's directive, counsel did not argue that there was no evidence in the record that Dr. Desai would not have cleared plaintiff for the surgery as the court had made clear "[t]hat's out of bounds." Defense counsel argued the standard of care did not require defendant to obtain clearance from any physician, and that plaintiffs had not proven that the alleged failure to obtain medical clearance caused plaintiff's injuries.

At plaintiffs' counsel's request and over objection by defendant, the judge incorporated the following curative instruction into his charge:

> Now, during the course of this trial, there have been many references made by counsel for both sides to a Dr. Desai, who was the plaintiff's primary care physician. There has been testimony that Dr. Desai had cleared the plaintiff for his eye surgeries, and a procedure to install an IVC filter in his leg, all prior to the inguinal hernia surgery, at issue, of June 27, 2012.
>
> A question has been raised as to whether Dr. Desai would or would not have cleared the plaintiff for his hernia repair surgery. Particular reference was made by defense counsel, in his opening statement, to the effect that there is no evidence that Dr. Desai would not have cleared the plaintiff for his hernia surgery.
>
> However, Dr. [Desai] has not testified. Despite the fact that it was within the right of each party to call Dr. Desai as a witness in this trial, neither side chose to

35

A-1838-18

do so. As a result, what Dr. Desai would or would not have done in terms of clearing Mr. Streckfuss for his hernia surgery at issue here, is unknowable, and, therefore, speculative.

As such, what Dr. Desai would or would not have done, in terms of clearance, is not something for you to consider in your deliberations, and you are to disregard any statement made that there is no evidence that he would not have cleared plaintiff for his hernia surgery.

Among the issues in their motion for a new trial, plaintiffs argued it was prejudicial error for defense counsel to have implied in his opening that Dr. Desai would have cleared plaintiff for surgery with no recommendations for medical management had he been consulted and then compounded the error by making a "missing witness" argument and misstating plaintiffs' burden of proof. In an argument reprised on appeal, plaintiffs contended that after successfully blocking plaintiffs from allowing Dr. Grossbard to testify to what a primary care internist would do if asked to clear plaintiff for surgery, defense counsel immediately thereafter in his own opening improperly invited the jury to speculate as to what Dr. Desai would have done, that is cleared plaintiff for surgery, and to wonder why plaintiffs weren't calling him to say what he would have done.

Plaintiffs claimed the errors were made worse when defense counsel argued plaintiffs could not prove proximate cause on their medical clearance

36

claim without establishing Dr. Desai would not have cleared plaintiff for surgery, when defendant's failure to consult Dr. Desai made it impossible to know what he would have recommended, and any testimony he offered at trial as to what he would have done if asked would have been barred as impermissibly speculative. Plaintiffs further claimed the prejudice was compounded by permitting defense counsel to elicit from Dr. Drew on cross-examination that he did not know what Dr. Desai would have recommended, and the court's curative instruction was insufficient to overcome the prejudice.

Defendant countered that medical clearance was a non-issue that plaintiffs injected into the case in the hope of capitalizing on defendant's office form in which a nurse checked a box stating medical clearance was required. Defendant contended that because Dr. Drew testified defendant deviated from the standard of care by not obtaining the necessary medical clearance, notwithstanding the only question they requested the jury decide was whether defendant was negligent by failing to use an anticoagulant during the surgery, defendant "was forced to play on the field that plaintiffs' built" and produce evidence that the absence of a medical clearance examination was not a deviation from the standard of care and not a proximate cause of plaintiff's injuries.

37

Defendant maintained the statement that there would be no evidence that Dr. Desai would have refused to clear plaintiff for the surgery was factually accurate and advanced a causation defense related to a standard of care claim plaintiffs were making at trial. Defendant also denied making a "missing witness" argument with regard to Dr. Desai, noting defense counsel had not requested a missing witness adverse inference and didn't know whether Dr. Desai, whom plaintiffs had subpoenaed for trial, would testify. Defendant further maintained that any possible prejudice from either was neutralized by the court's strongly worded curative instruction. Defendant maintained his anodyne statement that there would be "no established causal connection" between the lack of medical clearance and plaintiff's injuries did not misstate plaintiffs' burden of proof and is irrelevant in any event as the jury did not reach the issue of causation.

In addressing those points on plaintiffs' new trial motion, Judge McCloskey noted the case was a contentious one, tried by experienced and exceptionally skilled lawyers, and those two facts made him consider plaintiffs' arguments carefully, canvassing the record and his trial notes to ensure the evidence was sufficient to support the verdict and no inadvertent error resulted in a miscarriage of justice. The judge again noted that plaintiffs interjected the

issue of medical clearance into the case, and that defendant had a right to counter that claim. Acknowledging his agreement with plaintiffs that defense counsel crossed the line by stating in his opening that there was no evidence that Dr. Desai would not have cleared plaintiff for surgery, he found the curative instruction he delivered, which was largely based on language plaintiffs suggested, was sufficient to cure any prejudice.

As already noted, "[t]he standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge — whether there was a miscarriage of justice under the law." Hayes, 231 N.J. at 386 (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011)). In reviewing the trial record, however, we accord considerable deference to the trial judge's feel of the case, and that judge's "first-hand opportunity" to see and hear the witnesses as well as the lawyers, "assess[ing] their believability and their effect on the jury." Jastram v. Kruse, 197 N.J. 216, 230 (2008).

Having reviewed this record, we again find no reason to disturb the jury's verdict. We have no quarrel with the judge's decision to give a curative instruction, as it was well within his considerable discretion. See Bender v. Adelson, 187 N.J. 411, 433 (2006). We note, however, that plaintiffs initially requested a curative instruction based largely on their contention that the

medical clearance issue was a <u>Scafidi</u>[4] claim, and thus plaintiffs had no burden to prove whether medical clearance would have been given, but only that the failure to obtain the clearance increased the risk that plaintiff would develop DVT and was a substantial factor in the complications that ensued. The court and counsel ultimately determined that <u>Scafidi</u> did not apply, undermining plaintiffs' chief reason for requesting the curative instruction in the first instance.

We do not find any abuse of discretion in the trial court's handling of the issues surrounding Dr. Desai, and plaintiffs have not clearly and convincingly established any miscarriage of justice under the law. Defense counsel's opening and closing arguments to the jury were accurate and did not misrepresent the evidence. <u>See</u> <u>Morales-Hurtado v. Reinoso</u>, 457 N.J. Super. 170, 191 (App. Div. 2018), <u>aff'd o.b.</u>, 241 N.J. 590 (2020). Moreover, the testimony adduced from Dr. Drew was not inappropriate. As the judge noted several times, plaintiffs claimed defendant deviated from the standard of care by failure to insist on plaintiff obtaining clearance from Dr. Desai. Defense counsel was certainly permitted to argue against a finding of deviation and the absence of any connection between the alleged deviation and plaintiff's injuries. Any potential

---

[4] <u>Scafidi v. Seiler</u>, 119 NJ. 93 (1990).

prejudice to plaintiffs was cured by the court's detailed curative instruction, which the jury is presumed to have followed. See Verdicchio, 179 N.J. at 36.

As for plaintiffs' remaining arguments, defense counsel's referring to Dr. Drew in his closing argument as "the 99% man," a reference to the doctor's percentage of work for plaintiffs, was improper and unprofessional, although not sufficiently egregious to have denied plaintiffs a fair trial. See Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 171 (App. Div. 2004) (noting "[a]lthough attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness").

We find no impropriety in defense counsel's reference to the lottery in illustrating the use of statistics in measuring probabilities. Defense counsel used an example of how one could double their odds of winning the lottery by buying a second ticket but still have only a very small chance of winning, in order to assail plaintiffs' experts' argument about chemical prophylaxis making a difference in plaintiff's chances of developing DVT. The argument was fair comment on the evidence in the record, see Hayes, 231 N.J. at 387-88, and, in any event, related to the issue of causation that the jury never reached.

In sum, we are convinced by our review of this extensive record that Judge McCloskey deftly handled the many difficult issues posed in this long and hard-

41

fought trial by very experienced and knowledgeable medical malpractice lawyers on both sides. We find no error, either singularly or in combination, that could have denied plaintiffs a fair trial. Plaintiffs' remaining arguments, to the extent we have not addressed them, lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1838-18