**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1099-24

LOURDES GONZALEZ,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

908-910 WASHINGTON STREET,
LLC,

     Defendant-Respondent/
     Cross-Appellant,

and

S&B PLUMBING & HEATING
CORP.,

     Defendant.

_____

     Argued March 2, 2026 – Decided March 30, 2026

     Before Judges Sabatino, Walcott-Henderson and
     Bergman.

     On appeal from the Superior Court of New Jersey, Law
     Division, Hudson County, Docket No. L-3993-20.

Richard D. Picini argued the cause for appellant/cross-respondent (Caruso Smith Picini, PC, attorneys; Richard D. Picini, of counsel and on the briefs).

Janet Kalapos Corrigan argued the cause for respondent/cross-appellant (Leyden Capotorto Ritacco Corrigan & Sheehy, PC, attorneys; Janet Kalapos Corrigan, on the briefs).

PER CURIAM

This complicated civil litigation involving lead exposure in a plaintiff tenant's apartment unit returns to our court in the wake of our 2023 unpublished opinion remanding the case to the trial court. See Gonzalez v. 908-910 Washington Street, LLC, No. A-2463-22 (App. Div. Sept. 13, 2023). On remand, the case was tried before a jury, resulting in a no-cause verdict in favor of defendant. Plaintiff now appeals, and defendant provisionally cross-appeals certain rulings.

For the reasons that follow, we vacate the jury verdict and order a new trial. We do so because the trial court misclassified the rented premises as not being within the scope of the Hotel and Multiple Dwelling Act ("HMDA"), N.J.S.A. 55:13A-1 to -31. We reject all other arguments raised in the appeal and cross-appeal.

I.

We incorporate by reference and update the background recited in our earlier opinion.

Succinctly stated, this case stems from plaintiff Lourdes Gonzalez's discovery that the hot water system in her Hoboken apartment owned by defendant, 908-910 Washington Street, LLC ("the landlord"), contained nearly seventy times the amount of lead acceptable by Environmental Protection Agency ("EPA") standards. The lead apparently came from a baseboard heating system, which conveyed hot water to the sinks and a shower in the apartment through copper pipes. The pipes were bound together with solder that contained lead.

Plaintiff resided in the apartment unit for forty-six years, from 1974 to 2020, except for some temporary absences. She is disabled and has been unable to work since 2008. She attributes her inability to work to cognitive decline as a result of long-term lead poisoning from drinking the hot water in her unit.

An expert in environmental and occupational medicine who evaluated plaintiff opined that, in addition to being exposed to lead in the hot water, she also had been exposed to lead paint in the apartment. The expert came to this conclusion after reviewing the report of a home inspector who opined that,

3

because of the age of the apartment, lead paint was certainly used. The expert further opined that three miscarriages plaintiff had suffered in her twenties were attributable to lead toxicity.

Seeking compensation for her injuries from lead exposure, plaintiff filed this lawsuit naming several defendants: the landlord, a plumbing company (which has since been dismissed), and fictitious parties who installed the baseboard hot water system and piping. In her complaint, plaintiff alleged that defendant landlord[1] was negligent, breached the implied warranty of habitability, and violated the HMDA.[2]

The premises in question consists of two connected buildings. The landlord LLC owns the building that contains plaintiff's apartment, along with the neighboring brownstone, 910 Washington Street. Both the 908 and 910 buildings (respectively, "908" and "910") are three stories tall and have two apartments on the second and third floors. Since around 2001, they have shared

---

[1]  From this point forward, we refer to the landlord as "defendant," unless the context suggests otherwise.

[2]  Associated regulations require multiple dwellings to provide "potable water." N.J.A.C. 5:10-15.1 ("Every multiple dwelling and hotel shall be connected to a source of and system for delivery of potable water sufficient to meet the requirements for hot and cold water at all connected fixtures").

A-1099-24

a first floor, which is used for a restaurant also owned and operated by defendant.

Defendant acquired 908 and 910 in 2001 when Eugene Flinn and his wife, who previously owned the two properties separately, transferred their interests in 908 and 910 to defendant. Flinn and his wife are the sole members of the defendant LLC.

Plaintiff, along with her sisters, had previously sued this same landlord, asserting several distinct legal claims including breaches of the implied warranty of habitability based on the conditions of that apartment. That first lawsuit ended in a settlement, with an associated written release of all claims known or unknown related to that action.

Defendant initially succeeded in dismissing this current lawsuit based on the release, however the case was remanded by our court because the record at that time did not demonstrate that lead poisoning was within the contemplation of the parties when they entered into the release. Gonzalez, slip op. at 10.

After further discovery, defendant moved for summary judgment. Defendant argued that statements made by plaintiff's sister showed that plaintiff had contemplated the quality of the hot water at the time of the initial lawsuit. Defendant also argues that this evidence demonstrated the statute of limitations

A-1099-24

barred plaintiff's claim. This motion was denied, as well as a subsequent motion for reconsideration, and the case proceeded to a jury trial.

During discovery, plaintiff moved to substitute Flinn for one of the fictitious parties named in her complaint, because answers to interrogatories revealed he owned 908 as an individual in 1996, the time the heating was allegedly installed. This motion was rejected by the Civil Part Presiding Judge out of concern that Flinn would be unduly prejudiced due to the length of time in between the installation of the pipes and this lawsuit commencing.

Plaintiff moved again in limine to substitute Flinn. This time, a successor judge who presided over the trial ("the trial judge") denied reconsideration and ruled that plaintiff could not toll the statute of limitations by naming fictitious defendants because Flinn's identity as the owner of 908 was easily ascertainable before plaintiff filed her complaint.

The case was tried in the fall of 2024 before a jury. At the conclusion of plaintiff's case in chief at trial, defendant moved for a directed verdict against Count One of her complaint that defendant had violated the HMDA. Defendant argued plaintiff had only proved common ownership of 908 and 910 and that, because the addresses were on separate lots, neither had at least three dwelling units required to be subject to the Act. Defendant also claimed that the addresses

6

sharing a first floor did not change their legal status as separate buildings. The trial judge directed a verdict against plaintiff on this issue, principally reasoning that because the apartments had separated entrances and the addresses were on separate lots, the Act did not apply.

The trial judge also sustained defense objections to plaintiff's expert testimony, ruling the expert could not testify as to plaintiff's miscarriages and opine they related to lead toxicity because that testimony's prejudice substantially outweighed its probative value. The judge additionally sustained objections to the expert testimony on lead paint, ruling that expert had relied on the inadmissible opinion of the home inspector in making that conclusion.

The jury ultimately returned a no-cause verdict on plaintiff's remaining counts.

Plaintiff now appeals: (1) the denials of her motions to substitute Flinn for a fictitious party in the complaint (2) the directed verdict against Count One of her complaint and (3) the evidentiary rulings preventing testimony on reproductive toxicity and lead paint.

Defendant cross-appeals, primarily arguing that plaintiff's claim should have been dismissed because they were barred by the release and the statute of limitations.

A-1099-24

We focus on the key issue of the HMDA's application, which is the only issue in the appeal and cross-appeal that warrants appellate correction.

The HMDA ("the Act"), N.J.S.A. 55:13A-1 to -31, was one of several bills proposed by the Executive to the Legislature in 1967 with the goal of "assisting the communities in this most urban state of the nation." Executive Office Inter-Communication from Gov. Richard J. Hughes to the Members of the N.J. Legislature (Mar. 6, 1967). Then-Governor Hughes promoted the Act as being "aimed at updating and strengthening laws regulating hotels and multiple dwelling units to insure that all meet modern standards of health and safety." Ibid.

The Act was passed and became effective as of May 31, 1967. N.J.S.A. 55:13A-1. The Act defines a "multiple dwelling" as:

> Any building or structure of one or more stories and any land appurtenant thereto, and any portion thereof, in which three or more units of dwelling space are occupied, or are intended to be occupied by three or more persons who live independently of each other. This definition shall also mean any group of ten or more buildings on a single parcel of land or on contiguous parcels under common ownership, in each of which two units of dwelling space are occupied or intended to be occupied by two persons or households living independently of each other, and any land appurtenant thereto, and any portion thereof.

[N.J.S.A. 55:13A-3(k) (emphasis added).][3]

In the corresponding regulations, the term "building" is defined as:

> a structure built, erected and framed of component structural parts designed for the housing, shelter, enclosure and support of individuals, animals or property of any kind which is enclosed within exterior walls on all sides.
>
> [N.J.A.C. 5:10-2.2 (emphasis added).]

The Act recognizes that it is possible for a building that was not previously a multiple dwelling to become one through "conversion or alteration." N.J.S.A. 55:13A-3(k)(2).

Our application of the HMDA in this case is guided by its "declaration of policy," which prescribes as follows:

> This act being deemed and hereby declared remedial legislation necessary for the protection of the health and welfare of the residents of this State in order to assure the provision thereof of decent, standard and safe units of dwelling space, shall be liberally construed to effectuate the purposes and intent thereof.
>
> [N.J.S.A. 55:13A-2 (emphasis added).]

---

[3] The Act was amended in 1983. L. 1983, c. 447. The purpose of that amendment---not pertinent here--was to correct an "anomaly," in that property owners who rented many dwelling units to many tenants would not have been subject to the duties of the Act if those units were separated. Assemb. Housing and Urban Policy Committee Statement to A. No. 3191 (June 20, 1983) (L. 1983, c. 447).

A-1099-24

In applying the Act, our courts have generally taken notice of this legislative intent that it be "liberally construed," and have upheld broad applications of the statute in the interest of protecting the health and safety of tenants. See, e.g., Rumson Country Club v. Comm'r of Cmty. Aff's., 134 N.J. Super. 54. 59 (App. Div. 1975) (ruling that a country club with rooms for members was a "multiple dwelling"); Blair Acad. v. Sheehan, 149 N.J. Super. 113, 117 (App. Div. 1977) (upholding a finding that a boarding school was a "hotel" under the Act).

Other case law illustrates these expansive principles. In Bunting v. Sheehan, 156 N.J. Super. 14, 15 (App. Div. 1976), a landlord appealed a finding by the Commissioner of the Department of Community Affairs ("DCA") that his building was a multiple dwelling under the Act. 156 N.J. Super. at 15. The structure in question had two street addresses, with each address having a separate entrance and heating system. Id. at 16. Although underneath a single, unpierced roof, the premises of the two addresses were completely separated by an interior fire wall. Ibid. Before the landlord gained ownership of both addresses, they were separately owned and separately taxed, although our opinion did not specify whether the addresses were on separate lots. Id. at 16-

17. The Commissioner of the DCA determined the property to comprise a single building subject to the Act. Id. at 18. We affirmed that determination. Ibid.

Comparably, in Rothman v. Dep't of Cmty. Aff's, Bureau of Hous. Inspection, 226 N.J. Super. 229, 230 (App. Div. 1988), the DCA had determined that three buildings, each containing four apartments that were separated in half by an interior firewall, were multiple dwellings. In that case, the LLC that owned the buildings had separated the buildings' ownership by transferring half of each building to a couple, who were the LLC's president and vice president. Id. at 230. The landowner argued this separate ownership converted the properties into separate buildings with two apartments, and thereby not qualified as multiple dwellings under the HMDA. Id. at 233.

We rejected the owner's contention in Rothman and affirmed the DCA's classification. In doing so, we specifically noted that common ownership was not required to deem a building a multiple dwelling under the Act, except for subdivisions expressly addressed by the 1983 amendment. Id. at 233-34 (citing N.J.S.A. 55:13A-3(k)). We reasoned that if common ownership was a necessary element in determining whether a building was a multiple dwelling, the Legislature would have had no need to specify when common ownership was a factor in other portions of the Act. Ibid. That said, we also recognized in

11

Rothman the DCA Commissioner deemed it relevant that both halves of each building were effectively owned by the same people. Id. at 234-35. In sum, common ownership is not required to establish that properties qualify as multiple dwellings subject to the Act, although the presence of such common ownership can weigh in favor of such a classification.

As expressed in the Act and associated regulations, if a landlord's property qualifies as a "multiple dwelling", that landlord has affirmative duties, defined by regulation, to protect the health and safety of tenants. Especially pertinent here, those affirmative duties include: (1) a duty to provide potable hot and cold water, N.J.A.C. 5:10-15.1, and (2) a duty to test for the presence of lead paint. N.J.A.C. 5:10-6.6.

Affirmative duties imposed under the Act for multiple dwellings are distinct from a landlord's general duty to repair the premises. See, e.g., Braitman v. Overlook Terrace Corp., 68 N.J. 368, 385 (1975) (holding that although the plaintiffs did not include a violation of the HMDA in their original complaint, the Act created another basis for the landlord's liability in failing to properly install a lock on the apartment door). As the Supreme Court has observed, "[i]t, is entirely appropriate in an action to establish civil liability to consider the landlord's statutory and administrative responsibilities for his tenants to furnish

A-1099-24

habitable residential premises." Trentacost v. Brussel, 82 N.J. 214, 230 (1980). These statutory and regulatory requirements alter the standard of care a reasonable landlord should provide and "whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." Id. at 222 (citing Rappaport v. Nichols, 31 N.J. 188, 201 (1959)).

As we noted above, the present case involves parcels with two street addresses, 908 and 910, consisting of two connected structures. On the second and third floors of each structure there are two apartment units, one above the other. On the first floor spanning both structures there is a restaurant beneath the apartments. According to Flinn's deposition testimony that plaintiff proffered at trial, he acknowledged that 908 and 910 had been "merged" to utilize the entire first floor and cellar floor space of both structures for the restaurant. Plaintiff's sister and co-tenant Emily Vermeal, a fact witness who had seen the construction, testified that 908 was "merged physically" with 910, and "[the owners] made two openings from 908 Washington Street to 910 Washington Street, maybe three. The basement also connects the two buildings together." Vermeal further testified that someone could walk between 908 and 910 freely on the first floor and through the basement.

A-1099-24

At the conclusion of plaintiff's case in chief at trial, defendant moved for a directed verdict to dismiss Count One of the complaint, which alleged defendant was in breach of the HMDA. Defendant argued that the evidence plaintiff proffered merely showed that 908 and 910 were on separate plots, and that there simply had been a "doorway" constructed that connected the buildings through the retail space on the first floor. Defendant further argued that if 908 and 910 had truly been merged into one building, the premises would have had "one lot and block number." Defendant also stressed that the DCA had not determined that 908 and 910 was a multiple dwelling.

The trial judge granted defendant's motion and concluded that the premises did not qualify as a multiple dwelling under the Act. Among other things, the judge noted that the distinct lot and block numbers in the deeds evidenced that 908 and 910 were separate structures. The judge further noted that there was no physical connection upstairs between the apartments.

The judge also reasoned that common ownership was irrelevant to determining whether a building was a multiple dwelling. The judge accordingly regarded plaintiff's proof of common ownership and the "merger" of the first-floor retail/restaurant space insufficient to establish multiple-dwelling status under the Act. Instead, the premises were deemed to be two separate buildings,

14

each with only two apartments above them and therefore less than the three dwellings required under the Act.

Plaintiff argues the trial judge's rejection of multiple-dwelling status for the premises was erroneous. We evaluate that argument, de novo, because the proper statutory classification of the premises appears to entail a question of law. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); Serico v. Rothberg, 234 N.J 168,178 (2018). Having applied de novo review--and bearing in mind the legislative mandate to liberally construe the statute--we respectfully reverse the trial court's classification ruling under the HMDA and its entry of a directed verdict on Count One.

The present situation is comparable to the facts in Bunting, 156 N.J. Super. at 15-18, in which we treated two structures having separate street addresses and separate entrances, and which were physically separated by a fire wall, as a single multiple dwelling for the purposes of the Act. Here, there is even more of a nexus between the structures than in Bunting, by virtue of the first-floor restaurant and the unified basement that connect 908 with 910. It is not dispositive that the apartments upstairs are separated by a firewall. The first floor and basement have sufficient integration.

A-1099-24

Using the lay terminology adopted by Flinn, the two buildings were effectively "merged." In fact, plaintiff asserts (and no evidence to the contrary has been offered) that the properties, which are the subject of common variances, could not be sold at this point as two separate parcels.

In addition, the trial judge erred in treating the common ownership of 908 and 910 as irrelevant. As we noted above, under the case law, common ownership is not required to establish a multiple dwelling, but common ownership can nevertheless be a factor that weighs in favor of such a classification. Rothman, 226 N.J. Super. at 234-35. Here, there is such common ownership.

Further, the analysis does not turn on the absence of a finding by the DCA that these premises are a multiple dwelling. The question was never presented by anyone, landlord or tenant, to the DCA. We recognize the tenant had the option of reporting the landlord to regulatory authorities, but she had no obligation to do so. And there is nothing in the statute or case law that makes a DCA classification of the premises a prerequisite to invoking the HMDA in a civil lawsuit.

16

We therefore reverse the trial judge's classification. That legal error was of substantial consequence, because it materially affected the standards of duty that were used to instruct the jury.

If Count One had not been dismissed, plaintiff would have been entitled to have the court instruct the jury that, under the HMDA, a landlord of such multiple dwellings is required by statute to fulfill certain duties to tenants that go above and beyond the duties owed by other landlords. See Model (Civil) Jury Charge 5.20D ("Duty of Owner of Multi-Family House to Tenants and Others"). The Model Charge in subsection (A)(1) explains to jurors:

> Statutory and regulatory responsibilities establish a standard of conduct for landlords. If the defendant violated any statute/regulation, the violation may be considered by you as evidence of defendant's negligence. However, such violations are not conclusive on the issue of the defendant's negligence, and you are to consider all the evidence and circumstances to reach your decision on whether the defendant was negligent in this case.

Footnote 7 to the Model Charge underscores that important point:

> Under the Hotel and Multiple Dwelling Act, N.J.S.A. 55:13A-1 et seq., the Commissioner of the Department of Community Affairs is required to issue regulations to ensure that any hotel or motel dwelling, as defined in N.J.S.A. 55:13A-3 of the Act, will be constructed and maintained in a manner that protects the health, safety and welfare of the occupants and the public. N.J.S.A. 55:13A-7. These regulatory duties

17

have been promulgated in N.J.A.C. 5:10-6 to 27. In addition, the Legislature has codified certain specific duties of landlords/owners in statutes. See e.g., N.J.S.A. 55:13A-7.1 (Duty to provide smoke detectors or smoke alarms in conformance with regulations of the Commissioner of the Department of Community Affairs); N.J.S.A. 55:13A-7.13 (Duty to provide child protection window guards upon written request of tenant).

Plaintiff was deprived of the benefit and advocacy force of that Model Charge. Instead, plaintiff was forced to rely on the less stringent jury instruction concerning an alleged breach of the implied warranty of habitability, which makes no mention of a duty imposed by the Legislature. The jury never got to hear from the judge about the importance and relevance of that statutory duty. We recognize the model charge also makes clear that the violation of a statute, while indicative of a lack of due care, is not conclusive of negligence. Even so, the jury was not informed of a violation's pertinence.

We are unpersuaded by defendant's argument that Dwyer v. Skyline Apartments, Inc., 123 N.J. Super. 48, 51 (App. Div. 1973), aff'd o.b. 63 N.J. 577 (1973), renders the omission of the statutory jury charge inconsequential. In Dwyer, a tenant of a multiple dwelling sued her landlord for negligence after her showerhead faucet fell out of the tile walls and she was scalded by the hot water that came from the exposed pipe. Ibid. After a jury found the landlord

18

liable for the harm, this court reversed the verdict because the scalding water was a latent defect that could not have been reasonably discoverable by the landlord. Id. at 53. We ruled that, given the latent nature of the hazard, the landlord did not breach a duty to repair the condition. Id. at 56. Here, however, plaintiff's claims rest upon a greater duty: not simply a duty to repair a discoverable hazard, but an affirmative regulatory duty to provide tenants with potable water. That duty exists regardless of whether the landlord has actual or constructive notice that the water it is supplying is contaminated with lead. Hence, Dwyer is not on all fours with the present case.

Because of the court's classification error, plaintiff was materially disadvantaged by the omission of the model charge concerning statutory violations. The error was "clearly capable of producing an unjust result," see Rule 2:10-2, and was not harmless. "It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Prioleau v. Kentucky Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (quoting Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). "A charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations . . . [T]he court must explain the controlling legal principles and the questions the jury is to decide." Das v. Thani, 171 N.J. 518, 527 (2002)

(quoting State v. Martin, 119 N.J. 2, 15 (1990) (alterations in original)). Therefore, erroneous jury charges "are ordinarily presumed to be reversible error." Ibid. (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

For these reasons, the, the verdict must be set aside and plaintiff is entitled to a new trial with proper jury instructions that include a charge on the duties a landlord owes under the HMDA.

## III.

We briefly address, in no particular order, the remaining arguments presented by plaintiff on appeal, and by defendant in its cross-appeal.

## A.

Plaintiff argues the trial court, first in a pretrial ruling by the Civil Presiding Judge and thereafter by the trial judge, erred in denying her motions pursuant to Rule 4:26-4 to substitute Eugene Flinn for a fictitious defendant named in the complaint. We perceive no reversible error in those determinations.

The complaint asserted that a former, but unnamed, owner of the premises was responsible for the usage of lead-containing solder in the hot water pipes and therefore is liable for creating a dangerous condition that harmed plaintiff. As argued in her eventual motion for substitution, that prior owner was Eugune

Flinn, individually, who conveyed his ownership interest in the premises to the present LLC. Naming Flinn as a defendant would have provided plaintiff with an alternative theory of recovery for the harm caused by the lead exposure. That theory would not have required plaintiff to prove that Flinn, as the creator of the hazard, had notice of a patent defect.

In order to obtain the court's permission to substitute a person or entity for a fictitious party names in the complaint, a plaintiff must (1) "exercise due diligence in endeavoring to identify the responsible defendants <u>before</u> filing the original complaint" and (2) "act with due diligence in taking prompt steps to substitute the defendant's true name, after becoming aware of that defendant's identity." <u>Baez v. Paulo</u>, 453 N.J. Super. 422, 439 (App. Div. 2018) (emphasis added).

The trial court soundly determined that plaintiff failed to establish these requirements. As the Civil Presiding Judge noted, Flinn was easily identifiable as the premises owner of 908 from a search of public records long before plaintiff filed the present complaint in 2020 and moved for substitution in 2024. In fact, plaintiff named Flinn as the owner of 908 in her first lawsuit, which settled, and his role in installing the hot water system was specifically discussed in a deposition taken in that lawsuit.

A-1099-24

The court also reasonably took into account the asserted prejudice to Flinn of late substitution, such as the expiration of the statute of limitations as to him, the passage of time in locating records, and the need to secure personal counsel separate from the LLC after discovery and other pretrial activities had already been undertaken.

Plaintiff has not met her burden to show the trial court erred in denying substitution and in thereafter denying her pretrial motion in limine for equivalent relief.

B.

Plaintiff contends the trial judge erred in excluding opinion testimony from her medical causation expert on two subjects: (1) exposure to lead paint dust within her apartment (as distinct from the lead disseminated through the hot water pipes) and (2) reproductive toxicity that allegedly was a factor in causing her miscarriages. We review these evidentiary rulings with substantial deference to the trial court as gatekeeper to expert testimony. See N.J.R.E. 702 and 703; In re Accutane Litigation, 234 N.J. 340, 391 (2018). We will not disturb the trial court's decision unless the ruling demonstrably reflects an abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008); see also Carey v. Lovett, 132 N.J. 44, 64 (1993).

A-1099-24

We discern no abuse of discretion with respect to either of these evidentiary rulings limiting plaintiff's expert proofs. As to the lead paint topic, plaintiff's medical expert never inspected the apartment and made no direct observations of lead paint dust. Instead, the medical expert relied on a hearsay report of a home inspector who was not produced for cross-examination at trial. The home inspector opined that, given his observation of peeling paint and his belief about the age of the premises, the paint contained lead. Given the medical expert's reliance on those hearsay opinions, plaintiff should have produced the inspector for trial or substantiated those foundational opinions with other competent evidence. The court did not abuse its discretion in excluding the medical testimony based on the inspector's embedded hearsay. See N.J.R.E. 808; James v. Ruiz, 440 N.J. Super. 45, 73 (App. Div. 2015).

Likewise, the court did not abuse its discretion in excluding the medical expert's opinions about reproductive toxicity. Although plaintiff attested to having multiple miscarriages in her twenties, she did not present her medical records substantiating those miscarriages and that they occurred after the baseboard heating system was installed in 1996 when she was the age of thirty-one. Without such evidence, the causal link between the miscarriages and the heading system is speculative. Claims must not go to a jury based on

speculation.  <u>Merchants Express Money Order Co. v. Sun Nat'l Bank</u>, 374 N.J. Super. 556, 563 (App. Div. 2005).

C.

Turning to defendant's cross-appeal, we reject its arguments that the trial court was obligated to dismiss plaintiff's lawsuit because of (1) the May 2018 settlement of her previous lawsuit and associated release, and (2) the expiration of the statute of limitations.  The pretrial judge who ruled on those issues soundly rejected defendant's arguments.

The import of the release was specifically remanded by this court for further consideration in our previous opinion.  <u>Gonzalez</u>, slip. op. at 10.  On remand, the trial court carefully considered the language of the release and the attendant circumstances, and concluded that they did not bar the present cause of action.

As plaintiff aptly has put it, the first lawsuit concerned, in addition to other issues pertinent to the conditions of the apartment, the quantity of hot water being supplied to the apartment, not its quality or any potential lead contamination.  The language of the release as negotiated by counsel in the first case, does not manifestly exclude the present claims of toxicity.

24

The comments of Vermeal--who is not a party to this case--at her 2016 deposition, musing that the water had been "poisoning their family," at best was a personal lay opinion without substantiation at that time. Likewise, Vermeal's 2011 email to a health inspector expressing concerns about her mother drinking the water did not waive plaintiff's own rights. The trial court rightly concluded that neither of Vermeal's comments, nor the terms of the release, barred plaintiff individually from pursuing the lead toxicity claims she asserts in the present lawsuit.

Defendant failed to demonstrate that the safety of the water was "specifically considered at the time the [settlement] transaction was consummated" in 2018. Bilotti v. Accurate Forming Corp., 39 N.J. 184, 205 (1963). We affirm the trial court's decision.

Relatedly, we likewise sustain the pretrial judge's ruling that plaintiff's lead toxicity claims are not barred by the two-year statute of limitations for personal injury actions. The court fairly applied equitable "discovery rule" principles in concluding that plaintiff could not have reasonably known that she had a cause of action for the harm against the landlord until years after it was installed. Mancuso v. Mancuso, 209 N.J. Super. 51, 55 (App. Div. 1986). The

25

installation was approved by a building inspector, which would have given a reasonable tenant an objective impression that the system was safe.

Moreover, plaintiff's symptoms manifested gradually over time, and it was not until she received medical advice about the potential causal nexus to lead contamination that she would have sufficient grounds to pursue the present case. A reasonable person in her shoes would not have reason to believe defendant was the cause of her injury. Vispisiano v. Ashland Chem. Co., 107 N.J. 416, 432 (1987) (similarly applying these accrual principles in a workplace chemical exposure case).

### D.

Little needs to be said about defendant's argument that we should dismiss this appeal, post-briefing, because plaintiff filed it two business days after the forty-five-day deadline prescribed by Rule 2:4-1. The deadline is frequently relaxed in the interests of justice when, as here, the appeal is filed within thirty days after the forty-fifth day. See R. 2:4-4. Notably, defendant raised this argument in opposition to plaintiff's motion for leave to amend her appeal, and that opposition was rejected by a panel of this court. In addition, we must be mindful of the general longstanding principle that favors the disposition of cases

A-1099-24

on their merits.  Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 108 (1971).

## IV.

To the extent we have not discussed other points raised by the parties, they lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for a new trial with proper jury instructions that include the duties owed under the HMDA.  The trial court shall convene a case management conference within thirty days.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1099-24